Rollin GREEN and Jacqueline
Green, Appellants,

v.

ASSOCIATED MILK PRODUCERS, INC.,
Delbert E. Presnell, Kenneth Gniffke,
and Wayne B. Anderson, Appellees.

No. 81–2170.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1982.

Decided Nov. 5, 1982.

Sydney Berde, Richard M. Hagstrom, Berde & Hagstrom, P.A., St. Paul, Minn., for appellees.

Stephen P. Hurley, Madison, Wis., Allen H. Gibas, Minneapolis, Minn., for appellants.

Before McMILLIAN and ARNOLD, Circuit Judges, and VAN SICKLE,* District Judge.

ARNOLD, Circuit Judge.

Rollin Green and Jacqueline Green, his wife,[1] brought this action under Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976),[2] against Associated Milk Producers, Inc. (AMPI), and three of its employees, Delbert E. Presnell, Kenneth Gniffke, and Wayne B. Anderson, charging that the defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Specifically, the Greens allege that the defendants conspired with two independent milk haulers, James Kalina and Donald Schaak, and with several milk producers to allocate milk hauling customers and restrain competition in the milk

hauling business. The District Court[3] found no evidence of an unlawful conspiracy, granted summary judgment in favor of AMPI, and dismissed all claims.[4] We affirm.

I.

Since we review a summary judgment, we view the evidence most favorably to the Greens and give them "the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in the pleadings, depositions and affidavits in the case." *EEOC v. Liberty Loan Corp.,* 584 F.2d 853, 857 (8th Cir. 1978). The facts related below are stated in accordance with this standard.

AMPI is an incorporated dairy cooperative engaged in hauling, processing, and marketing milk and milk products in several states. Its members, dairy farmers who ship their milk to AMPI plants, control the cooperative through elected representatives who set policies for management to follow. AMPI owns and operates dairies in Rochester and New Prague, Minnesota. At all relevant times, Wayne B. Anderson was manager of the New Prague division, and Delbert E. Presnell was manager of the Rochester division.

Because it is perishable, milk must be picked up every day. This is done by haulers. Some haulers are employed by AMPI, while some are independent. The haulers are responsible for weighing, sampling, and

---

* The Hon. Bruce M. Van Sickle, United States District Judge for the District of North Dakota, sitting by designation.

1. Jacqueline Green helped her husband in his milk-hauling business by serving as bookkeeper, secretary, and general assistant.

2. This statute was amended by Section 4 of the Antitrust Procedural Improvements Act of 1980, Pub.L. No. 96–349, 94 Stat. 1156, which permits awards of prejudgment interest to private antitrust plaintiffs. The instant case is not governed by this provision because the complaint was filed before September 12, 1980, the effective date of the Act.

3. The Hon. Diana E. Murphy, United States District Judge for the District of Minnesota. Although the court's Memorandum Opinion and Order was not reported officially, it ap-

pears at 1981–2 Trade Cas. (CCH) ¶ 64,346 (Sept. 30, 1981).

4. There were several pendent claims, based on state law, in addition to the federal antitrust claim. Green alleged claims based on the Minnesota Antitrust Law of 1971, Minn.Stat.Ann. §§ 325D.49–.66 (West 1981), the common-law prohibition against interference with contract, common-law defamation, and breach of contract. AMPI counterclaimed, alleging breach of the carrier's contract and seeking to collect under an indemnification agreement. The District Court, after dismissing the federal antitrust claim, considered the factors set forth in *Koke v. Stifel, Nicolaus & Co.,* 620 F.2d 1340, 1346 (8th Cir. 1980), and determined the pendent claims should be dismissed too. The dismissal of the pendent claims is without prejudice to their reassertion in the state courts.

transporting to the processing plant the milk of the producers on their routes. The plant pays the producer upon the basis of the weight measured and recorded on the manifest at the farm and the butterfat content of the sample. The state regulates various aspects of milk hauling.

Independent haulers establish routes, which consist of a number of producers for whom milk is hauled to a particular plant. These routes are bought and sold, and haulers solicit one another's customers, sometimes competing on the basis of the hauling fee charged the farmers. The plant to which the producer's milk is shipped deducts the hauling fee from the money owed the producer for his or her milk and pays the hauler.

In order to reduce hauling costs, AMPI arranges and rearranges hauling routes. At all relevant times, Kenneth Gniffke was AMPI's regional procurement director, responsible for preventing two or three independent haulers destined for the same plant from traveling the same roads. He did this by redrawing routes and having haulers trade customers.

In 1976 the Greens bought a route destined for AMPI's Rochester plant from another independent hauler. They made this purchase so that some of their existing patrons, for whom they had been hauling to the Mid-America Dairies plant in Zumbrota, Minnesota, could switch to the AMPI plant.[5] On December 13, 1976, Rollin Green signed a "Carrier's Contract" with AMPI in which he agreed to haul the milk of AMPI members in the Minnesota counties of Dakota, Rice, and Goodhue "to such plant or plants as AMPI may from time to time designate."

Some of the Greens' patrons who began shipping to the AMPI Rochester plant were located in what had been the procurement area of AMPI's New Prague plant. The Rochester plant paid these producers a hauling subsidy so that they would not lose

money by shipping to AMPI.[6] The two AMPI plants began to compete with each other for milk, and problems arose because producers in the same area were shipping to different AMPI plants and were receiving different prices for their milk. Anderson, manager of the New Prague division, wanted the milk from this area to go to New Prague.

In October 1977 Gniffke and Anderson met individually with Rollin Green and two other independent haulers, Kalina and Schaak, who had New Prague routes. As a result of these meetings, the three haulers' routes were redrawn and some of their customers were traded. The Greens were dissatisfied with the arrangement because it required them to haul partial loads to both the Rochester and New Prague plants, and this was uneconomical for them. After the Greens complained, the routes were rearranged so that the Greens hauled only to Rochester, but they had to give up some of their patrons to the other haulers.

On August 3, 1978, members of AMPI management, including Anderson and Presnell, met with some of the producers on the Greens' route to discuss the Greens' performance. Minutes of this meeting show that the participants aired grievances about the Greens, agreed that AMPI would not lose patrons by taking over the Greens' route, and decided that the Greens should be fired. This was to be done at an official hauling committee meeting on Monday, August 7, 1978. Presnell stated at the August 3 meeting that arrangements for handling the milk of the Greens' patrons would be made in a meeting on Friday, August 4, with New Prague and Rochester fieldmen. He also said that fieldmen would inform the patrons that Braun, one of the Greens' haulers, would continue to haul for AMPI, and that there would be a meeting of procurement people from Rochester and New Prague to divide routes again.

---

**5.** Mid-America Dairies was reducing the price it paid for milk.

**6.** Generally, the milk hauling fee increases as distance from the farm to the dairy increases. Even if AMPI paid producers a higher price for

milk than its competitors, an increased hauling fee could mean the farmer would suffer a net loss by changing dairies. Therefore, dairies may subsidize the farmer's cost of hauling.

On August 7, 1978, the AMPI hauling committee, composed of producers on the Greens' route, met with AMPI management beginning at 11:30 a.m. at a cafe in Cannon Falls, Minnesota. AMPI management told the producers that the Greens were delivering loads of milk that were short-weight, contained high bacteria counts, and were watered. The Greens had been told to come to the meeting at 3:00 p.m.; they were not told what the meeting was about. When they were allowed to enter the meeting, the Greens were told the hauling committee had voted unanimously to terminate their hauling services. They were not told the reasons for this decision and were not allowed to speak.

After the meeting, Anderson, Presnell, Gniffke, and two other AMPI employees met with Kalina and Schaak in Northfield, Minnesota. They agreed to divide the patrons on the Greens' route among Schaak, Kalina, and AMPI employees. The next morning, AMPI fieldmen began visiting the producers and told them that the Greens had been terminated for poor service. The Greens lost all their customers, and their milk-hauling business failed.

## II.

The Greens sued, charging (1) that AMPI and the individual defendants combined and conspired with Kalina and Schaak to allocate customers and markets for milk hauling among themselves in the counties surrounding the New Prague and Rochester plants and to keep other milk haulers from freely competing within that area, and (2) that the defendants conspired with individual milk producers to boycott and terminate the Greens' milk-hauling business. The Greens alleged that in furtherance of the conspiracy, (1) AMPI held periodic meetings with milk haulers at which milk-hauling customers were exchanged, geographic territories for each hauler were established, and the destinations to which each hauler could transport milk were established; (2) the defendants met with producers on the Greens' route on August 7, 1978, and agreed to fire the Greens, tell the Greens' other customers of their decision, and assign other haulers to haul the Greens' customers' milk; and (3) the defendants contacted all the Greens' customers, told them that the Greens had stolen, watered down, and contaminated the milk of their customers and were out of the business, and appropriated these customers for AMPI, Kalina, and Schaak.

The District Court concluded, after reviewing the complaint and materials offered in opposition to the motion for summary judgment, that the Greens alleged three conspiracies:

(1) conspiracy between AMPI and its employees to restrain competition in the milk hauling business, (2) conspiracy between AMPI, its employees, and supplier members to boycott and refuse to deal with Green, and (3) conspiracy between AMPI and two milk haulers [Kalina and Schaak] to keep other milk haulers from freely competing in the relevant market and to put Green out of business.

*Green v. Associated Milk Producers, Inc.,* 1981–2 Trade Cas. (CCH) ¶ 64,346, at p. 74,599 (D.Minn. Sept. 30, 1981). The Greens assert that the District Court misconstrued the complaint, and that in fact they alleged only a single conspiracy between AMPI and its rival competitor haulers to restrain and prevent competition in the milk-hauling business by allocating customers and markets for milk hauling. Assuming the Greens to be correct, we do not believe that the difference in characterization matters.

## III.

■ The District Court correctly held that there was no conspiracy between AMPI and its employees, Presnell, Anderson, and Gniffke.

Since more than one person or entity is required to establish a conspiracy, the general rule is that a conspiracy cannot be based on an agreement between a corporation and its officers, agents or employees. The only exception arises when the officers or agents were, at the time of the conspiracy, acting beyond the scope of their authority or for their own benefit.

*Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 917 (8th Cir. 1976) (citations omitted). The Greens argue that the minutes of the August 3, 1978, meeting demonstrate that the AMPI employees were acting beyond the scope of their authority. We disagree. Although the minutes support an inference that Presnell and Anderson had decided to use their influence with the hauling committee to see that the Greens were fired and, in anticipation of that end, had made some arrangements and plans so that hauling service to the Greens' patrons would not be interrupted, there ·is no suggestion that this was outside the scope of their authority as AMPI managers.

█ The District Court was correct also in holding that there was no unlawful conspiracy between AMPI and its producer-members. The Capper-Volstead Act, 7 U.S.C. § 291 (1976), exempts from the operation of the antitrust laws "persons engaged in the production of agricultural products as ... dairymen ... [who] act together in associations ... in collectively processing, preparing for market, handling, and marketing ... such products of persons so engaged." [7] "Handling" encompasses milk hauling. The nature of milk as a product is such that it must be transported quickly and under controlled conditions to the processing plant so that its freshness and purity are maintained. It is therefore central to the functions of a milk co-op to insure that this transportation takes place properly. *Accord, Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F.Supp. 608 (M.D.Ga.), *appeal docketed*, No. 81–7308 (11th Cir. Apr. 10, 1981). Thus, on the facts presented here, AMPI and its members are considered a single entity for purposes of the antitrust laws and, consequently, incapable of conspiring with ·each other.

█ The Greens seek to avoid application of the Capper-Volstead exemption by arguing that the "Carrier's Contract" entered into by AMPI and Rollin Green establishes that milk hauling is outside the scope of the co-op's legitimate activity, because the contract says that AMPI contracts not as a co-op, but as agent for the individual milk producers, each of whom has final authority to choose who will haul his or her milk. This is a distinction without a difference; a co-op is simply a collection of member-farmers. In addition, the contract was worded as it was purely for state-law reasons in an attempt, for example, to avoid tort liability on the part of AMPI for the acts of haulers.

The Capper-Volstead exemption, however, does not extend to situations in which a cooperative conspires with non-cooperatives. *United States v. Borden Co.*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939). Here, the Greens have alleged that AMPI conspired with outside milk haulers, Kalina and Schaak. Nonetheless, the District Court correctly ruled that the Greens failed to establish that there was a genuine issue of material fact. There is no evidence that Kalina and Schaak conspired with AMPI to terminate the Greens. At most, we can infer from the minutes of the August 3, 1978, meeting that Kalina and Schaak knew in advance that the Greens probably would be terminated and that they agreed to take over the Greens' route if that happened. This leaves us with simply a unilateral decision by AMPI to terminate the Greens, plus an agreement about who would pick up the milk in the event the termination occurred.

█ The Greens also allege that the initial agreement between AMPI and various haulers, including the Greens, Kalina, and Schaak, was unlawful insofar as it placed territorial restrictions on the haulers. To recover under Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), however, the Greens must establish a causal relationship between the alleged antitrust violation and the injury suffered. *E.g., Rosebrough Monument Co. v. Memorial Park Cemetery Association*, 666 F.2d 1130 (8th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982). The District Court

---

7. For a general discussion of the scope of the Capper-Volstead exemption, see *Alexander v. National Farmers Org.*, 687 F.2d 1173, at 1182– 1183 (8th Cir. 1982). We see nothing in *Alexander* inconsistent with our opinion in this case.

correctly ruled that the evidence, even when viewed in the most favorable light, failed to justify an inference that the Greens were injured by the initial territorial restrictions. Their damage, if any, was wholly the result of their later termination, which we have held was not unlawful. It is unnecessary for us to decide, therefore, whether the territorial restrictions placed on haulers by AMPI were unlawful, or whether they would be shielded from antitrust liability by the Capper-Volstead Act.

Accordingly, the judgment of the District Court is affirmed.