**NORTHFIELD NATIONAL BANK, presently known as First Bank (N.A.)—Northfield, Plaintiff,**

v.

**ASSOCIATED MILK PRODUCERS, INC., defendant and third party plaintiff, Appellant,**

v.

**Rollin C. GREEN, et al., third party defendants, Respondents.**

No. C1–85–1712.

Court of Appeals of Minnesota.

June 24, 1986.

Review Denied Aug. 27, 1986.

Sydney Berde, R. Scott Miller, Jr., Sydney Berde & Associates, St. Paul, for appellant.

Allen H. Gibas, Gibas, Richey & Dube, Minneapolis, Stephen Hurley, Aagard, Hurley, Burish & Milliken, Madison, for respondents.

Heard, considered and decided by SEDGWICK, P.J., and PARKER and FORSBERG, JJ.

## OPINION

FORSBERG, Judge.

Associated Milk Producers, Inc. (AMPI) appeals from a judgment entered June 12, 1985, and from an order filed the same day, denying its motions for judgment notwithstanding the verdict (jnov), a new trial, or remittitur. Rollie and Jackie Green appeal from the portions of the order vacating the jury's award for damage to Jackie Green's reputation and permitting a set-off on an indemnity claim. Greens appeal the trial court's failure to award prejudgment interest on hauling fees wrongfully withheld by AMPI, its award of attorney fees and costs to AMPI on the indemnity claim. Additionally, Greens appeal from the trial court's refusal to award certain overhead and deposition costs. We affirm in part and reverse in part.

## FACTS

AMPI is an incorporated cooperative association which is engaged in the business of hauling, processing, and marketing milk and milk products. It is run by its dairy farmer members, who elect representatives on the district, divisional, regional, and corporate level. Delbert Presnell, Kenneth Griffke, and Wayne Anderson are AMPI employees.

AMPI does business in a number of states. In Minnesota it owns and operates dairies in Rochester and New Prague. The supply of milk for these dairies is obtained from independent dairy farmer producers in surrounding counties. All such producers are considered to be AMPI members, although not all sign membership agreements.

Producer-members' milk is hauled to the dairy either by AMPI's own haulers or by independent haulers. Large "bulk trucks" are used to haul the milk, which must be picked up daily to prevent spoilage. It is the milk hauler's task to pick up, weigh, and sample individual producers' milk along with his hauling route, and transport the milk to a milk processing plant. Milk haulers are examined and licensed by the state, and the state regulates various aspects of the methods of sampling and handling milk.

Rollie Green entered the milk hauling business in 1967. His wife, Jackie Green, assisted as a bookkeeper, secretary, and general assistant. In 1976, Green was engaged in hauling milk to a dairy in Zumbrota, Minnesota, Mid-American Dairies (Mid-Am). Because of a drop in prices paid by that dairy, a number of his customers began to have their milk hauled to other dairies. Seeking an alternative route to haul milk, he bought the route of another hauler, the destination of which was the Rochester AMPI plant.

On December 13, 1976, Green signed a "Carrier's Contract" whereby he agreed to haul milk produced by AMPI members in Dakota, Rice and Goodhue counties to AMPI plants. The Carrier's Contract was also signed by Jim Griffin, an employee of AMPI's Rochester Plant "as agent for its producer-members in the * * * designated procurement area."

The contract states in part:

This agreement made and entered into * * * by and between Associated Milk Producers, Inc. * * * as agent for its producer members in the procurement area hereinafter designated, and Rollin Green, an independent milk hauler * * * 4. It is mutually understood and agreed that AMPI is acting herein as agent for producers * * * and that the transportation services provided herein by carrier are performed by him as an independent contractor for each of such producers for whom he hauls milk or milk products, and carrier shall not be, nor hold himself out as, an agent or employee of AMPI, but shall, at all times act for producers for whom he hauls milk or milk products.

The Carrier's Contract provided that AMPI was obligated to collect the hauling fee from each producer and remit it to Greens. The hauling fee, negotiated by a Hauling Committee consisting of some producer-members, was paid to Green in addition to a hauling subsidy paid by AMPI from its own funds.

Initially there was some question whether Green should haul to New Prague or Rochester, but it was subsequently decided he could haul to Rochester. Because Greens' route now contained new AMPI members whose farms were located within the New Prague procurement area, there was an overlap of procurement areas. The new members had formerly been members of a route which Greens hauled to Mid-Am.

AMPI created a new procurement zone (Zone 6) for its Rochester division. This zone covered the geographic area with which the milk producers on Greens' Mid-Am route were located. The Rochester division began paying its Zone 2 price, which was higher, within Zone 6. The Rochester plant began to pay a hauling subsidy to producers located within Zone 6 in order to attract milk of producers who were located a greater distance from the

dairy. AMPI's New Prague plant did not subsidize the cost of hauling and the Rochester plant subsidized no other hauler's rate. Farmers who were members of Mid-Am's Zumbrota plant began to use the AMPI Rochester plant and AMPI's Rochester and New Prague plants began to compete for milk supplies.

Subsequently, AMPI divided the Greens' hauling route. Under this arrangement, dividing lines were drawn at Minnesota Highway 3 and Interstate Highway 35W. Greens were not to deliver milk produced east of Highway 3 to New Prague or milk produced west of Highway 3 to Rochester.

Greens were dissatisfied with this arrangement because it required them to haul milk to separate plants and required them to haul partial loads. They expressed disapproval of the plan, and in June of 1978 it was changed to allow them to haul exclusively to Rochester, but they were required to give up some hauling customers to other haulers.

On August 3, 1978, a meeting was held by AMPI management and some producers along Greens' route to discuss alleged problems with Greens' performance as a hauler. Prior to the meeting AMPI management had received complaints from producer-members about Greens' hauling performance. It was agreed by those present at the meeting that money due Greens for their hauling services would not be paid to them. Presnell solicited the producers' cooperation to terminate Greens at a meeting to be held August 7, 1978. Greens had no knowledge of the August 3 meeting.

On August 7, 1978, an AMPI hauling committee composed of producers along Greens' route met with AMPI employees. Greens were advised of the meeting only a few hours before it started, were not told the nature of the meeting, and were not allowed to speak. At that time AMPI employees informed the milk producers present at the meeting that Greens had delivered loads of milk which were short weight, had high bacteria counts, and were watered. Greens were told they could no longer haul milk from the farmers to AMPI's plants. The next morning AMPI fieldmen began visiting the producers and told them that the Greens had been terminated for poor service.

Greens lost all of their customers and their milk hauling business failed.

Greens filed a complaint in April 1979 in the United States District Court, District of Minnesota, for damages to their milk hauling business. In the federal suit Greens pled federal antitrust violations based on a conspiracy to restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). The federal complaint contained four state claims including (1) antitrust violations under Minn.Stat. §§ 325D.49 *et. seq.*, (2) tortious interference with Greens' milk hauling contracts with AMPI's members, (3) defamation, and (4) damages for failure to pay hauling fees due to Greens.

AMPI counterclaimed seeking damages on an indemnity agreement running from Greens to AMPI for payment made and expenses incurred by AMPI on its guarantee of a promissory note from Greens to the Northfield National Bank. The loan was made for Greens' milk hauling business. AMPI also sought damages for Greens' alleged breach of the Carrier's Contract with AMPI.

The federal district court granted a summary judgment in favor of AMPI on the federal antitrust claim. The ruling was based in part on the grounds that under the Capper-Volstead Act, 7 U.S.C. § 291 (1976), and § 6 of the Clayton Act, a cooperative and its members are a single entity for antitrust purposes and are thus incapable of conspiring with each other. *Green v. Associated Milk Producers, Inc.*, 1981–2 Trade Cas. (CCH) ¶ 64, 346 (D.Minn.1981). The court dismissed the pendent state claims without prejudice to their refiling in state court. *Id.* The Eighth Circuit Court of Appeals affirmed the decision in *Green v. Associated Milk Producers, Inc.*, 692 F.2d 1153 (8th Cir.1982).

### The State Suit

This action was commenced, also in April 1979, by the Northfield Bank against AMPI

for sums due the bank on AMPI's guarantee of the loan to Greens, which was in default. In November 1980, while the federal action was pending, AMPI brought a third-party complaint in the state action against Greens for indemnity. Greens denied liability on the guarantee, alleging that their default was caused by AMPI. Greens filed a counterclaim alleging the four pendent causes of action. AMPI counterclaimed with its pendent breach of contract claim against Greens.

AMPI's motion for summary judgment was granted with respect to Greens' state antitrust action, on *res judicata* grounds. It was denied with respect to AMPI's argument that the federal case collaterally estopped litigation of the question whether AMPI was a party to the Carrier's Contract. The court denied summary judgment on all other issues.

The bank's action was settled by AMPI's payment under its guarantee, AMPI reserving its rights to proceed on the indemnity claim against Greens. During pre-trial proceedings on the indemnity claim, the trial court granted partial summary judgment that AMPI was entitled to indemnity as a matter of law, but reserved a final ruling on the cause of action for consideration of Greens' argument that AMPI was equitably estopped from recovery. By agreement of the parties, the equitable claim was tried to the court in the course of the jury trial with leave to supplement the testimony with any additional evidence relevant to the indemnity claim.

A trial on the remaining issues began in October, 1984. The jury found in special interrogatories that AMPI had slandered the Greens and wrongfully interfered with the Greens' business relationships with the dairy farmers whose milk they hauled, without privilege. The jury found that Rollie and Jackie Green were partners. They assessed compensatory damages of $70,000 for Rollie Green on the slander claim, $20,000 for Jackie Green on the slander claim, and $250,000 for both Greens for loss of business. It also awarded $20,000 in punitive damages.

The jury found that Rollie Green entered into a contract with AMPI to haul milk which Green breached. The jury also found that AMPI was not entitled to damages because the breach had been waived. On November 30, 1984, the trial court issued an order for judgment in conformity with the jury's answers. Entry of the judgment was stayed by stipulation of the parties until resolution of post-trial motions.

### Rulings on Post-Trial Motions

AMPI brought post-trial motions for entry of judgment on its indemnity claim for a jnov, a new trial or remittitur. The court ruled that AMPI was entitled to a set-off of $34,710.40 on its indemnity claim. This figure represents $33,500.00 of principal that was outstanding on the loan, plus $12,866.00 accrued interest, minus $18,961.24 in hauling fees that AMPI wrongfully withheld from Greens, plus $6,761.25 AMPI incurred in attorney fees in defense and settlement of the suit on its guarantee, and $544.39 for AMPI's costs in the suit. The court made the award on the grounds that invalidating the indemnity agreement would afford Greens a double recovery.

On the slander issue the trial court ruled that the jury was properly instructed on AMPI's defense of truth and Greens' burden of showing abuse of privilege. The court ruled there was sufficient evidence to support the jury's answers to the slander interrogatories, including proof of an improper motive by AMPI of either appropriating the Greens' route and customers or removing the inconvenience of milk "cross-hauled" from New Prague to Rochester.

AMPI claimed that the jury's answers to interrogatories that it wrongfully interfered with the contract between Greens and the farmers, should not stand because AMPI was party to the same contract. The trial court ruled that AMPI was not a party to that contract:

A reasonable interpretation of the evidence is that a milk hauler has two overlapping contracts or business relationship: First, he contracts with individual

farmers to pick up milk and deliver it for a hauling fee, to be deducted from the dairy's payment for the milk; second, he contracts with a dairy to accept the milk and pay a hauling fee which may include, as it did at times in this case, an added fee from the dairy which is not deducted from the farmer's milk check.

The court also ruled that notwithstanding an agency relationship between AMPI and the farmers, AMPI and its members were separate entities for purposes of the wrongful interference claim:

> There was enough evidence of AMPI's corporate and bureaucratic interests in interfering with the Greens' hauling business to support the jury's implicit finding that AMPI was not acting as agent for the producers for whom Rollin Green hauled. As such AMPI * * * was acting in its own interests and outside the protection of the agency relationship.

The court ruled the interference was unjustified. AMPI's conduct was improper, the court ruled, because it employed the improper means of slander and because it used anti-competitive methods to avoid the need for price, service or other legitimate economic competition with the Greens.

AMPI also challenged the jury's damage awards. The trial court upheld all but the $20,000 slander award to Jackie Green. The award to Jackie Green was stricken by the court, based on the jury's finding that AMPI had not made any statements that Jackie Green had committed any act of dishonesty. The court ruled that the jury necessarily concluded that Jackie Green was not slandered except in her business capacity as a partner in the milk hauling business, for which damages were already assessed.

Greens appealed from the clerk's taxation of costs on July 29, 1985, which the trial court affirmed for the most part. The court denied a request for costs of deposition transcripts and for overhead expenses including photocopying, postage and long distance telephone calls. Most of the depositions had been taken in connection with the federal suit. On September 4, 1985, Greens moved the court to reconsider. The court affirmed its prior order.

## ISSUES

I. Was the trial court bound by collateral estoppel to hold that AMPI was a party to the Carrier's Contract?

II. Did the trial court err by failing to hold AMPI was a party to the Carrier's Contract?

III. Is the jury verdict irreconcilable?

IV. Did the trial court err by failing to reduce the jury's damages awards?

V. Did the trial court err by failing to credit Greens with statutory interest on $18,961.24, the hauling fees which were wrongfully retained by AMPI?

VI. Did the trial court err by vacating the jury's award of $20,000 for damage to Jackie Green's reputation?

VII. Did the trial court err by allowing AMPI to set off $34,710.40 pursuant to AMPI's indemnity claim?

VIII. Did the trial court abuse its discretion in refusing to award Greens overhead costs and costs for depositions taken for the federal suit?

## ANALYSIS

### I.

Appellant argues that under the doctrine of collateral estoppel the trial court should have determined that the Carrier's Contract was a contract between the Greens and AMPI, just as it claims the federal district court and appeals court found. *See* *Green v. Associated Milk Producers, Inc.,* 692 F.2d 1153 (8th Cir.1982); *Green v. Associated Milk Producers, Inc.,* 1981–2 Trade Cas. (CCH) ¶ 64, 346 (D.Minn.1981). Had the trial court so found, appellant maintains, it would have dismissed the wrongful interference claim since AMPI is incapable of interfering with a contract to which it is a party.

Collateral estoppel is appropriate where:

(1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Kaiser v. Northern States Power Co.,* 353 N.W.2d 899, 902 (Minn.1984). The issue must be "necessary and essential" to the resulting judgment. *Ellis v. Minneapolis Commission on Civil Rights,* 319 N.W.2d 702, 704 (Minn.1982). The supreme court has stated that "[a] basic prerequisite to the application of collateral estoppel is that the issue now involved is identical to one previously litigated." *Kaiser,* 353 N.W.2d at 907.

■ There are references in the opinions that assume that AMPI was a party to the Carrier's Contract. The Eighth Circuit Court of Appeals stated:

The Greens seek to avoid application of the Capper-Volstead exemption by arguing that the "Carrier's Contract" entered into by AMPI and Rollin Green establishes that milk hauling is outside the scope of the co-op's legitimate activity, because the contract says that AMPI contracts not as a co-op, but as agent for the individual milk producers, each of whom has final authority to choose who will haul his or her milk. This is a distinction without a difference, a co-op is simply a collection of member-farmers.

*Green,* 692 F.2d at 1157.

However, the federal decisions were applying federal antitrust law. They did not deal with contract construction under Minnesota law. The appeals court stated:

The Capper-Volstead Act, 7 U.S.C. § 291 (1976), exempts from the operation of the antitrust laws "persons engaged in the production of agricultural products as * * * dairymen * * * [who] act together in associations * * * in collectively processing, preparing for market, handling, and marketing * * * such products of persons so engaged."

 * * * * * *

Thus, on the facts presented here, AMPI and its members are considered a single entity *for purposes of the antitrust laws,* and, consequently, incapable of conspiring with each other.

*Id.* at 1157 (emphasis supplied).

Collateral estoppel does not apply here for several reasons. The issues are not identical. The issue in the federal suit was whether AMPI and the farmers could conspire under federal law. The issue now presented concerns the contractual relationships between Greens, AMPI and the farmers. Greens did not have a "full and fair" opportunity to litigate whether AMPI was a party to the Carrier's Contract for purposes of state law claims. Additionally, because the federal case involved federal statutes which apply to federal antitrust claims, references to AMPI as a party to the contract were not essential to the prior judgment holding that no conspiracy had been shown to exist for antitrust purposes.

## II.

■ Appellant claims the trial court erred in instructing the jury that "the Carrier's Contract was between Greens and the farmers." Actually, the jury was instructed that in order to find wrongful interference "the Greens must persuade you" that the Carrier's Contract was between Greens and the farmers. It was an element which the jury had to find before it could find that AMPI interfered with Greens' business relationships with the farmers. The jury was obviously persuaded that AMPI was not a party to the Carrier's Contract.

The plain language of the contract supports this view. The Carrier's Contract specifically states that AMPI's status under the contract was that of an "agent" for its producer-members. The contract characterizes Greens as "independent contractors" for the producers. The Eighth Circuit Court of Appeals noted in its decision that:

[T]he contract was worded as it was purely for state law reasons in an at-

tempt, for example, to avoid tort liability on the part of AMPI for the acts of haulers.

*Green,* 692 F.2d at 1157. *See Ossenfort v. Associated Milk Producers, Inc.,* 254 N.W.2d 672 (Minn.1977) (injured plaintiff sought damages against AMPI as an employer of the milk hauler involved).

With respect to these hidden motives, the trial court ruled that:

[A] contract must be construed to determine "the intent of the parties as expressed in the language of the instrument, regardless of any actual or secret intent differing from the language employed." [citations omitted] Disregarding the contract language would elevate the undisclosed, private intent of AMPI over the objective interpretation of the language drafted by AMPI and agreed to by the Greens.

The court properly upheld the verdict on the basis that Greens had two overlapping contracts, the Carrier's Contract, between Greens and the individual farmers, and another between Greens and AMPI. When AMPI signed the Carrier's Contract by its employee, James Griffin, it did so only as agent for each milk producer and did not act on its own behalf.

### III.

Appellant argues that the jury's finding that Greens breached a contract with AMPI, is irreconcilable with the jury's findings that (1) AMPI's interfered with contractual relations between the Greens and the farmers and (2) that AMPI had defamed Greens. Appellant's argument is that AMPI was a party to the Carrier's Contract and that this is the same contract Greens breached. The findings are inconsistent, according to appellant, because

The bizarre result is that AMPI was found liable for communicating to its members Green's misconduct which constituted his breach and which formed the basis for his termination. Instead of granting AMPI compensation for its losses resulting from watered and short weight milk, the jury awarded the

Greens $360,000 in damages for losing a milk hauling business through their own misconduct.

■ Appellant argues that since it was a party to the Carrier's Contract, the defamation and interference were privileged, citing *Gasbarro v. Lever Brothers Co.,* 490 F.2d 424 (7th Cir.1973). A qualified or conditional privilege may protect a defendant from liability for defamatory statements where the defendant reasonably believed he had a duty to make a certain communication, which the defendant believes to be true, to another with a corresponding interest. *Id.* at 426. The privilege is lost if the plaintiff can show the defendant acted with actual malice. *See id.* AMPI claims the communication made to the Hauling Committee and the farmers was done to protect the shared interest of AMPI and its member-producers in the proper hauling of milk. The interference is privileged as well, according to appellant, since the slander is the tort that forms the basis of the tortious interference claim.

■ A jury's special verdict answers must be reconciled on review whenever possible. *Carufel v. Steven,* 293 N.W.2d 47, 48 (Minn.1980). The flaw in AMPI's argument is that the jury never made a finding that Rollie Green breached the Carrier's Contract. The jury found the Carrier's Contract was between Greens and the farmers. The trial court reconciled the verdict when it stated that a reasonable interpretation of the jury's findings is that the jury found two contracts to exist—one between Greens and the farmers and another between Greens and AMPI. We agree.

### IV.

#### *Loss of Business*

Appellant challenges the method of valuation on the $250,000 loss of business award. Appellant argues that Greens paid little or nothing for the various routes which they added to their milk hauling business ($6,956 in one case) and that Greens' net profit on tax returns was also

much lower ($6,114.63 one year, for example).

Respondents argue that the testimony of their expert, Dr. Gerald Nolte, an agricultural economist, supports the method of valuation. They argue that the award accounts for the fact that Greens' business was growing rapidly and becoming more efficient. To limit damages for loss of business to the amount Greens paid for it, they claim, "is akin to saying that if one finds a diamond, it has no value.".

The trial court properly relied on the expert's testimony that a reasonable method of valuation is to use a percentage of gross annual revenue. The trial court upheld the award because based on that method, the evidence established that Greens had gross receipts of approximately $100,000 for the first seven months of 1978, suggesting a value of $170,000 for the business.

The court acknowledged that the award was at the high end of reasonable because the award amounted to 125 percent of Greens' estimated annual receipts instead of the more strongly supported 100 percent. However, the award was supported by evidence that (1) the milk hauling business was seasonal so that significantly greater receipts would result in the second half of the year, that (2) Greens had experienced rapid growth of their business, that (3) Greens had heavy capital investment in their business, and that (4) Rollie Green had obvious talents as a developer of new routes. We agree with the trial court that the award was reasonable.

### Punitive Damages

Appellant's argument regarding the punitive damages award rests entirely on the concept that Green breached the Carrier's Contract. As previously stated, the jury must have found two contracts in this case. The contract breached by Green was not the Carrier's Contract—it was a different contract, one between Greens and AMPI.

Slanders affecting a plaintiff in his business, trade, or profession are slanders *per se*. *E.g., Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980). Punitive damages may be awarded in cases of *per se* defamation even absent proof of actual damages, to deter false and malicious attacks on a person's business reputation. *See id.* at 259. The appropriate amount of punitive damages is within the province of the jury. *Id.* It will not be disturbed on appeal unless it is so excessive that it is unreasonable. *Id.*

Here the jury found AMPI had slandered Greens, without privilege, thereby interfering with their business relationships with the dairy farmers. As a result, Greens lost all their customers and their milk hauling business failed. Just as the supreme court held in *Stuempges*, we believe that "this is the type of unsanctioned behavior for which punitive damages are appropriate." *Id.* at 259. Under the circumstances, the jury's award of $20,000 is not unreasonable. This award was within the jury's discretion.

### Slander of Rollie Green

Appellant claims the slander award for Rollie Green's reputation was based on passion and prejudice because his reputation in the community was poor even prior to the August meetings. This argument is without support. Appellant cites only parts of testimony of one witness, Carl Hunter, which indicates Green had a poor reputation. No mention is made of what time period the witness was referring to. Additionally, Hunter was one of Greens' patrons to whom AMPI published its slanderous remarks. We agree with the trial court that the evidence was sufficient to support the jury's findings on defamation.

### V.

Respondents claim the trial court should have granted them prejudgment interest on the $18,961.24 hauling fees payment wrongfully withheld from Greens. They argue that statutory interest should be awarded on this sum from August 7, 1978, the date the sum was wrongfully withheld,

through June 12, 1985, the date judgment was entered.

 Greens are precluded from recovering this item since they had already stipulated to the amount owed for hauling fees. The stipulation was incorporated into a court order. For whatever reason, Greens failed to include interest on the hauling fees in the stipulation. Additionally, they failed to argue to the trial court that they were entitled to prejudgment interest on the hauling fees.

### VI.

 Respondent asks this court to reinstate the jury's $20,000 award for damages to Jackie Green's reputation. The trial court vacated the award because "the jury necessarily concluded that Jackie Green was not slandered, except in her business capacity," for which she was already compensated by the damage award for the business loss.

The trial court properly vacated this award since the jury found as a fact that AMPI did not slander Jackie Green personally. To reinstate it would allow a double recovery.

### VII.

 Respondents claim the trial court erred in permitting the set-off on AMPI's indemnity agreement with Greens. The trial court, having previously determined that AMPI was entitled to the indemnity set-off at law, ruled that equity also weighed in favor of AMPI on the indemnity claim.

The trial court reasoned that:

The gravamen of the Greens' argument is not that AMPI interfered with their business relationship with the bank, but that AMPI interfered with their business relationship with the farmers for whom they hauled and thus destroyed their ability to generate income with which to pay the bank.

The Greens argued the injury to their ability to earn money in their case to the jury; were this court to find a separate compensable injury to their ability to pay

money a classic double recovery would result.

Respondents argue that equity is not available to a litigant with unclean hands. *See e.g., Earle R. Hanson & Associates v. Farmers Co-op. Creamery Co.*, 403 F.2d 65, 70 (8th Cir.1968). They argue that AMPI caused them to default on their loan with the bank and that AMPI should not be allowed to profit from its wrongdoing. They also claim that AMPI was unjustly enriched when the court permitted the set-off.

We disagree. Since Greens had use of the money borrowed from the bank, requiring them to reimburse AMPI for repayment of the loan does not unjustly enrich AMPI. AMPI does not profit under this arrangement. Furthermore, the underlying obligation was owed by Greens to the bank, not to AMPI.

 Respondents also argue that it should not have to pay AMPI attorney fees and expenses AMPI incurred. Inclusion of attorney fees and expenses is presumed in guaranty agreements. *Logefeil v. Logefeil*, 367 N.W.2d 114, 116 (Minn.Ct.App. 1985). However, the supreme court has stated that the right to recover attorney fees and costs of defense under indemnity agreements arises only where the guarantor is compelled to defend no misfeasance of his own. *Sorenson v. Safety Flate, Inc.*, 306 Minn. 300, 305, 235 N.W.2d 848, 851 (1975). The question is whether Greens' default on the loan is sufficiently separate from AMPI's slander causing Greens to lose their business. *See id.* at 306, 235 N.W.2d at 852. AMPI's misfeasance was the direct cause of Greens' default. The trial court properly allowed the indemnity set-off except for $544.39 costs and $6,761.25 attorney fees incurred by AMPI in defense of the guarantee.

### VIII.

 Appellants claim the trial court erred in refusing to allow them costs for overhead expenses and deposition transcripts. They argue that even though most

of the depositions were taken in connection with the federal suit, they related to the pendant state law claims which were subsequently the subject of this action. Appellants point out that the trial court stated at the July 29, 1985 hearing that the depositions were necessary and were skillfully used by Greens' attorneys.

The prevailing party is entitled to costs reasonably incurred in bringing an action. Minn.Stat. § 549.04 (1984). Which costs are allowed and in what amount involves some discretion on the part of the trial judge, though. *Romain v. Pebble Creek Partners*, 310 N.W.2d 118, 123 (Minn.1981). As a general matter, courts should be reluctant to expand the list of costs taxable to a losing party. *Id.*

We hold that the Greens should be reimbursed for the cost of those deposition transcripts which were used in this case, since the trial court determined they were necessary. As for the overhead costs, we decline to disturb the trial court's ruling, mindful of the discretion involved and the supreme court's admonition against expanding the list of costs.

### DECISION

Collateral estoppel does not apply where the issue whether AMPI was a party to the Carrier's Contract was not previously determined, where Greens did not have an opportunity to litigate the issue in the prior action and where references in the prior case to AMPI's status under the contract were not essential to the holding. The plain language of the Carrier's Contract controls its interpretation. Thus AMPI's status under the contract was only that of agent for its producer-members; AMPI was not a party to the contract. The jury's verdict can be reconciled. A reasonable interpretation of the jury's findings that the jury found two contracts existed: one between Greens and the farmers and another between Greens and AMPI. A damage award of $250,000 for loss of business valued by a percentage of the gross annual revenue was reasonable. An award of punitive damages was within the jury's discretion. The award of damages for Rollie Green's reputation is supported by the evidence. The trial court properly refused to award prejudgment interest on the $18,-961.24 hauling fee payment wrongfully withheld from Greens by AMPI where it was not part of the parties' stipulation. The trial court properly vacated the jury's award of $20,000 for damages to Jackie Green's reputation. The trial court properly allowed the indemnity set-off but erred by awarding AMPI a set-off for attorney fees. Greens are entitled to costs for deposition transcripts used in this case.

Affirmed in part, reversed in part.