666 A.2d 1379

MURRAY M. CONNELL, CONNELL CONTRACTING, INC., EASTERN SECURITY MANAGEMENT, INC., AND WATERFRONT CENTER, L.P., PLAINTIFFS, AND ANTHONY DELL'AQUILA, PLAINTIFF–APPELLANT/CROSS–RESPONDENT, v. EAST RIVER SAVINGS BANK (RIVERBANK AMERICA), AND TRUST COMPANY OF NEW JERSEY, DEFENDANTS–RESPONDENTS/CROSS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued October 24, 1995—Decided November 21, 1995.

Before Judges MICHELS, BAIME and VILLANUEVA.

*Robert W. Delventhal* argued the cause for appellant/cross-respondent (*Dillon, Bitar & Luther,* attorneys; *Mr. Delventhal,* of counsel and on the brief; *Mary Rose Migliazza,* of *Crummy, Del Deo, Dolan, Griffinger & Vecchione,* on the brief).

*Philip B. Seaton* argued the cause for respondent/cross-appellant East River Savings Bank (*Kozlov, Seaton, Romanini & Brooks,* attorneys; *Wright, Manning, Rips & Maloney,* of the

New York bar, of counsel; *Mr. Seaton, James J. Maloney,* and *David F. Bayne,* on the brief).

*Justin P. Walder* argued the cause for respondent/cross-appellant Trust Company of New Jersey (*Walder, Sondak, Berkeley & Brogan,* attorneys; *Mr. Walder,* of counsel and on the brief; *John A. Brogan,* on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

This appeal and cross-appeal arise out of a judgment entered in favor of East River Savings Bank (East River) and Trust Company of New Jersey (Trust Company) in a suit brought by Murray Connell, Connell Contracting, Inc., Eastern Security Management, Inc. and Anthony Dell'Aquila for alleged violations of the Bank Holding Company Act, 12 *U.S.C.A.* §§ 1971 to 1978 (the Act). The Act prohibits banks from engaging in certain anti-competitive tying arrangements and enables an injured party to recover treble damages and counsel fees. Plaintiffs claimed that East River and Trust Company issued a loan commitment that contained anti-competitive conditions barred by the Act and that these conditions caused plaintiffs to reject the commitment, thus preventing them from developing a large tract of waterfront property in Hoboken. Specifically, the conditions precluded Dell'Aquila from pursuing litigation involving a neighboring development in which the banks had an alleged interest, required him to provide an easement that would benefit the neighboring development, and provided the banks with rights of first refusal to lease office space for banking use and to finance later construction on the Hoboken property. Following a protracted non-jury trial, Judge Tarleton found that the litigation and easement conditions violated the Act, but that plaintiffs rejected the loan offer for entirely different reasons and, therefore, suffered no compensable injury.

Dell'Aquila appeals, contending that the trial judge erred by (1) finding no causation of injury, (2) failing to award nominal damages and and attorneys' fees, (3) relying on deposition testimony which was adduced by an improper hypothetical question, (4) excluding evidence of East River's subsequent loan commitment, (5) basing his conclusion on hearsay evidence, and (6) adopting a conclusion that could not reasonably have been reached on the evidence. East River cross-appeals, claiming that the trial judge erred by (1) holding it responsible for Trust Company's violations of the Act, (2) finding that the loan commitment contained illegal tying arrangements, and (3) dismissing its common law defenses. Trust Company also cross-appeals, arguing that the trial judge erred by (1) rejecting its claim of judicial estoppel, (2) holding that plaintiffs were bank "customers" under the Act, (3) finding it responsible despite its "secondary" participation, (4) finding that it had a relationship beyond that of creditor-debtor with the neighboring developer, (5) concluding that it had violated the Act by including illegal conditions in the loan commitment, (6) dismissing its common law defenses, and (7) refusing to award attorneys' fees under *N.J.S.A.* 2A:15–59.1.

The record contains substantial credible evidence supporting the Chancery Division's finding that Dell'Aquila rejected the loan offer for business reasons wholly unrelated to the illegal conditions contained in the commitment. Defendants' violation of the Act did not cause any injury to the plaintiffs. We thus affirm the Chancery Division's judgment for the reasons expressed by Judge Tarleton in his thorough oral opinion. All but one of the contentions advanced in the cross-appeals are alternative arguments for sustaining the Chancery Division's judgment and, therefore, need not be addressed. The one remaining argument—that dealing with attorneys' fees under the frivolous litigation statute—is clearly without merit. *R.* 2:11–3(e)(1)(E).

## I.

We need not recount the facts at length. The trial spanned some two and one-half years and generated a transcript of approx-

imately 16,000 pages. We would be remiss were we to fail to note the excellent quality of the copious briefs submitted, which exhaustively recite and analyze the parties' factual contentions. Our brief recitation is intended merely to highlight the facts critical to Judge Tarleton's ultimate conclusion.

Between 1977 and 1987, Dell'Aquila acquired or obtained options to purchase six parcels of waterfront property in Hoboken. On July 31, 1987, Dell'Aquila agreed to join with Connell as co-venturers for the development of these tracts and in purchasing the Bethlehem Shipyards for this purpose. Connell was to pay Dell'Aquila $1,000,000 and secure financing of $19,000,000 by August 14 and an additional $75,000,000 by August 30. Dell'Aquila was to contribute his property. The parties set September 30 as the closing date.

Connell enlisted an investment banker, Lewis Ranieri, to secure the necessary financing. Ranieri retained Mabon Nugent, an investment bank, for this purpose. The agreement was extended until December 24 on the condition that Connell and Ranieri procure a loan of $85,000,000, instead of the $75,000,000 initially agreed upon. A Mabon Nugent team consisting of Michael Joseph, Roderick O'Connor, and Stephen Fuchs began an intensive search for financing.

After an abortive attempt to secure the loan from another financial institution, attention focused upon East River. Following a series of meetings with East River's representatives, Alvin Dworman, Shepard Forest, and Frances D'Loren, Connell sent East River a $200,000 good faith deposit. However, once it became clear that Connell would be unable to obtain a requested letter of credit in the amount of $15,000,000 or equity financing in the sum of $20,000,000, East River apprised the prospective borrowers that it would not lend the full $85,000,000 requested. Connell continued his efforts to obtain financing elsewhere.

East River remained interested in the proposed development and subsequently consulted with Siggi Wilzig, chairman of the board and president of Trust Company. Wilzig had prior dealings

with Dell'Aquila and agreed to participate in the loan to the extent of $5,000,000. Wilzig also had a banking relationship with a competing developer, the team of Daniel Gans and George Vallone, who were attempting to develop a site adjacent to that of Dell'Aquila.

The exact parameters of Wilzig's relationship with Gans and Vallone can fairly be characterized as murky. At one point, Wilzig was apparently offered a one-third equity interest in their development, but William Zeckendorf, a New York participant in the venture, refused to deal with Wilzig. In any event, Trust Company extended credit to Gans and Vallone, and Wilzig participated in many meetings with them, including one in which they advised Wilzig of "access" problems relating to their proposed development. Wilzig suggested obtaining an easement from Dell'Aquila, but learned that Dell'Aquila had instituted a Chancery Division action to stop the Gans and Vallone development altogether.

Ultimately, Wilzig told Forest that East River should condition its loan to Dell'Aquila and Connell on (1) Dell'Aquila's granting the City of Hoboken an easement which would provide greater access to Gans' and Vallone's property, (2) Dell'Aquila's agreeing to cease all legal actions against Gans and Vallone, and (3) Dell'Aquila's allowing Trust Company to be the exclusive bank office in the development and to provide construction financing. In subsequent conversations, Forest told Wilzig that the conditions should be deleted if "anyone object[ed] to them." Joseph later told D'Loren that Dell'Aquila disagreed with the easement and litigation conditions.

On November 30, a meeting was held to discuss the conditions of East River's proposed loan. Present were Dell'Aquila, his financial advisor Thomas Stagnitti, Connell, Joseph, Forest, D'Loren, Wilzig, and a representative of Mabon Nugent. Significantly, the easement and litigation conditions were never mentioned in the course of the meeting. Instead, the borrowers vigorously objected to the proposed financial terms of the loan. East River was unwilling to extend credit beyond $55,000,000.

This term was particularly disturbing to Dell'Aquila, who wanted to use $10,000,000 of the loan proceeds for other purposes. Dell'Aquila also objected to the interest rate, the fees and points, and a condition which required additional participation by other banks in the amount of $30,000,000.

Despite the borrowers' objections to the financial terms of the proposed loan, East River retained the law firm of Mudge, Rose to draft a loan commitment. The commitment's business terms did not materially differ from those previously proposed by East River. The commitment also contained the conditions requiring Dell'Aquila to terminate the litigation he was pursuing against Gans' and Vallone's project, to grant an easement which would ease Gans' and Vallone's access problems, and to grant Trust Company the right of first refusal to lease exclusive banking office space in the development and to provide construction financing.

The commitment letter was signed by an East River loan executive on December 22. Wilzig took the signed original, saying that he would deliver it to Dell'Aquila the next day. However, before delivering the commitment, Wilzig met with Gans and Vallone and showed them the litigation, easement, and first refusal conditions. At Wilzig's request, D'Loren waited until December 24 before telecopying the commitment to Mabon Nugent.

Conflicting testimony concerning the subsequent negotiations was presented at trial. Dell'Aquila testified that D'Loren told him none of the commitment terms could be changed. However, D'Loren testified she told Joseph in a telephone conversation on December 24 that the litigation, easement, and right of first refusal conditions were not essential to the deal and would be deleted if the borrowers objected. Joseph's testimony corroborated that of D'Loren. He claimed he told Dell'Aquila that East River was prepared to delete the litigation and easement conditions, but insisted on retaining the key financial terms, including the $55,000,000 limit of the loan, the interest rate and the participation requirement. Dell'Aquila responded that he "liked [the deletion of the Wilzig conditions], but it wasn't enough to carry all

of the other objections." We note further that Dell'Aquila in his deposition testimony conceded he would not have accepted the loan offer even if the Wilzig conditions had been deleted. Although Dell'Aquila denied this when he testified at trial, we point out that Stagnitti in his letter of December 29 rejecting the loan commitment did not even mention the litigation, easement, and right of first refusal conditions.

Based on this evidence, Judge Tarleton concluded that, although the terms requiring rights of first refusal were not illegal, the litigation and easement conditions contained in the loan commitment constituted anti-competitive tying arrangements in violation of the Act. The judge found that Wilzig sought the litigation and easement conditions to benefit Gans' and Vallone's development. This, in turn, would have potentially benefitted Wilzig and both banks because Wilzig, Trust Company, and possibly East River hoped to participate in financing Gans' and Vallone's other projects. The judge nevertheless determined that these violations did not cause any injury to the plaintiffs. In that context, the judge emphasized that plaintiffs' agent, Mabon Nugent, knew Wilzig's conditions were not necessary to the commitment, and that Dell'Aquila, Connell and Stagnitti were so informed. Judge Tarleton determined that Dell'Aquila rejected the commitment because he "found the business and financial terms too onerous." The judge concluded that Dell'Aquila would have rejected the loan commitment even if all of the illegal conditions had been omitted and that none of these conditions, either singly or in combination, constituted a material cause of the rejection.

## II.

We review Judge Tarleton's factual findings in the context of the Bank Holding Company Act, 12 *U.S.C.A.* §§ 1971 to 1978. Section 1972 of the Act provides in pertinent part:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

(B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;

(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; or

(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

[12 *U.S.C.A.* § 1972].

The purpose of Section 1972 is to apply the general antitrust principles of the Sherman and Clayton antitrust laws to commercial banking without requiring proof of either the economic power of the lending institution or the specific anti-competitive effects of tying arrangements. *Campbell v. Wells Fargo Bank, N.A.,* 781 *F.*2d 440, 443 (5th Cir.), *cert. denied,* 476 *U.S.* 1159, 106 *S.Ct.* 2279, 90 *L.Ed.*2d 721 (1986); *Parsons Steel, Inc. v. First Alabama Bank of Montgomery,* 679 *F.*2d 242, 245 (11th Cir.1982); *Swerdloff v. Miami Nat'l Bank,* 584 *F.*2d 54, 58 (5th Cir.1978). "[T]ying arrangements involving a bank are made unlawful by this [S]ection without any showing of specific adverse effects on competition or other restraints of trade and without any showing of some degree of bank dominance or control over the tying product or service." Sen.Rep. No. 1084, 91st Cong., 2d Sess. (1970), *reprinted in 1970 U.S.C.C.A.N.,* 5519, 5558 (Supplementary Views of Edward W. Brooke). To establish a violation of Section 1972, the "unusual banking practice" must be shown to be a tying arrangement, and "the plaintiffs must prove the existence of 'anti-competitive practices which require bank customers to accept ... some other service or product ... in order to obtain the bank product or service they desire.' " *Parsons Steel v. First Alabama Bank of Montgomery,* 679 *F.*2d at 246 (quoting 1970 *U.S.C.C.A.N.*

at 5535). Generally speaking, the statute bars a bank from imposing conditions beyond those reasonably related to protecting its investment in the transaction or transactions at hand. *See Tose v. First Pennsylvania Bank,* 648 *F.*2d 879, 897 (3rd Cir.), *cert. denied,* 454 *U.S.* 893, 102 *S.Ct.* 390, 70 *L.Ed.*2d 208 (1981); *B.C. Recreational Indus. v. First Nat'l Bank of Boston,* 639 *F.*2d 828, 832 (1st Cir.1981).

The Act provides both public and private remedies. United States Attorneys are authorized to "institute proceedings in equity to prevent and restrain ... violations" of Section 1972. 12 *U.S.C.A.* § 1973. They may also seek civil penalties not to exceed the lesser of $1,000,000 or one percent of the total assets of the offending bank. 12 *U.S.C.A.* § 1972(F)(IV).

■ Section 1975 permits private parties to bring actions to recover damages for injuries suffered due to violations of the Act. 12 *U.S.C.A.* § 1975. That Section provides in pertinent part:

> Any person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee.

[12 *U.S.C.A.* § 1975 (emphasis added)]. We have underscored the phrase "[a]ny person who is injured in his business or property by reason of anything forbidden in section 1972," because that statutory language expresses a clear limitation on the class of individuals and entities entitled to relief under the Act.

As we noted earlier, the Bank Holding Company Act borrows antitrust principles from the Sherman and Clayton antitrust laws. *Campbell v. Wells Fargo Bank, N.A.,* 781 *F.*2d at 443. It is thus instructive that the statutory language of the Clayton Antitrust Act defining the class of persons entitled to maintain a private damage action for antitrust violations is all but identical to that before us in this case. *See* 15 *U.S.C.A.* § 15(a). In construing Section 1975, therefore, it is helpful to refer to decisions dealing with its antitrust counterpart. *See Campbell v. Wells Fargo*

*Bank, N.A.,* 781 *F*.2d at 443; *Exchange Nat'l Bank of Chicago v. Daniels,* 768 *F*.2d 140, 143 (7th Cir.1985); *Swerdloff v. Miami Nat'l Bank,* 584 *F*.2d at 58–59.

We thus point to an unbroken line of decisions holding that "[i]n order to recover treble damages [and counsel fees] under the antitrust laws, a plaintiff must show a violation of the antitrust laws, the fact of damage, and some indication of the amount of damage." *Response of Carolina, Inc. v. Leasco Response, Inc.,* 537 *F*.2d 1307, 1320 (5th Cir.1976); *see also In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 *F*.2d 1144, 1176 (3rd Cir.) ("[O]ne pursuing antitrust recovery must establish that the damages suffered were caused by the defendant's participation in a scheme repugnant to the antitrust laws."), *cert. dismissed,* —— U.S. ——, 114 *S.Ct.* 625, 126 *L.Ed.*2d 589 (1993), *and cert. dismissed,* —— U.S. ——, 114 *S.Ct.* 652, 126 *L.Ed.*2d 610 (1993), *and cert. denied,* —— U.S. ——, 114 *S.Ct.* 921, 127 *L.Ed.*2d 215 (1994); *Argus, Inc. v. Eastman Kodak Co.,* 801 *F*.2d 38, 41 (2d Cir.1986), *cert. denied,* 479 *U.S.* 1088, 107 *S.Ct.* 1295, 94 *L.Ed.*2d 151 (1987); *Green v. Associated Milk Producers, Inc.,* 692 *F*.2d 1153, 1157 (8th Cir.1982); *Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n,* 666 *F*.2d 1130, 1146 (8th Cir.1981), *cert. denied,* 457 *U.S.* 1111, 102 *S.Ct.* 2915, 73 *L.Ed.*2d 1321 (1982); *Copper Liquor, Inc. v. Adolph Coors Co.,* 624 *F*.2d 575, 580 (5th Cir.1980); *Comfort Trane Air Conditioning Co. v. Trane Co.,* 592 *F*.2d 1373, 1383 (5th Cir.1979). Causation is "a necessary element of any claim for relief under ... the Clayton Act." *Argus, Inc. v. Eastman Kodak Co.,* 801 *F*.2d at 41. "[L]ack of causation in fact is fatal to the merits of any antitrust claim." *Ibid.; see also Nelson v. Monroe Regional Medical Center,* 925 *F*.2d 1555, 1562–63 (7th Cir.), *cert. denied,* 502 *U.S.* 903, 112 *S.Ct.* 285, 116 *L.Ed.*2d 236 (1991). To that extent, an essential element of any private party's claim is that the injury would not have occurred but for the antitrust violation. *See Argus, Inc. v. Eastman Kodak Co.,* 801 *F*.2d at 41.

Wholly apart from the element of "cause in fact," a plaintiff must also establish that the injury was "proximately caused" by the defendant's misconduct. To satisfy this requisite, the claimant must show that the proscribed anti-competitive activity was "a material cause of the injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 *U.S.* 100, 114 n. 9, 89 *S.Ct.* 1562, 1571 n. 9, 23 *L.Ed.*2d 129, 143 n. 9 (1969); *Alabama v. Blue Bird Body Co.*, 573 *F.*2d 309, 317 (5th Cir.1978). In other words, it must be established "with a fair degree of certainty [ ] that defendant's illegal conduct materially contributed to the injury." *Terrell v. Household Goods Carriers' Bureau*, 494 *F.*2d 16, 20 (5th Cir.), *cert. dismissed*, 419 *U.S.* 987, 95 *S.Ct.* 246, 42 *L.Ed.*2d 260 (1974).

Against this backdrop, we are in complete accord with Judge Tarleton's conclusion that Dell'Aquila failed to establish an injury which was causally linked to the illegal conditions contained in the commitment. The evidence amply supports the judge's finding that Dell'Aquila rejected the loan commitment for reasons other than the illegal tying arrangements imposed by the banks. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974).

We reject Dell'Aquila's claim that he was not required to establish cause in fact or proximate cause because the liability and damage aspects of the trial were bifurcated and evidence of causally connected injury was to be presented at the damage phase. The "fact of damage" was a necessary element in establishing liability. *Sciambra v. Graham News*, 892 *F.*2d 411, 415 (5th Cir.1990). As noted by the United States Supreme Court, albeit in a somewhat different context, antitrust injury is " 'injury of the type the antitrust laws were intended to prevent and ... flows from that which makes defendants' acts unlawful.' " *Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 *U.S.* 328, 334, 110 *S.Ct.* 1884, 1889, 109 *L.Ed.*2d 333, 343 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 *U.S.* 477, 489, 97 *S.Ct.* 690, 697–98, 50 *L.Ed.*2d 701 (1977)). "[T]he meaning of 'liability' for antitrust purposes [does not] change when a trial is bifurcated."

*Response of Carolina v. Leasco Response, Inc.*, 537 *F.*2d at 1320. Like the *Leasco* court, we "perceive no basis in law or logic to give 'liability' [a] different meaning depending upon the trial procedure used." *Id.* at 1320–21. Bifurcation of issues "in no way diminishes the requirement that a plaintiff show some evidence that the violation caused him injury before a defendant is found 'liable.'" *Id.* at 1321.

Equally unpersuasive is Dell'Aquila's suggestion that "injury" was established by evidence that he paid the Mudge, Rose firm's fee for preparing the commitment. The fact remains that he rejected the commitment for reasons other than the illegal conditions. He thus was not "injured ... by reason of anything forbidden in [S]ection 1972," a necessary ingredient for the recovery of damages under the language of Section 1975.

We need not tarry with Dell'Aquila's remaining contention that nominal damages should have been awarded, thus allowing him to recover attorneys' fees. An antitrust plaintiff who is awarded nominal damages would presumably be entitled to recover attorneys' fees. *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 *F.*2d 425, 442 (3rd Cir.1993) (Greenberg, J., concurring). However, nominal damages are awarded only where there is proof of the fact of injury caused by an antitrust violation. *See Sciambra v. Graham News*, 892 *F.*2d at 415. That element was not established in this case.

### III.

We find no merit in Dell'Aquila's remaining contentions. *R.* 2:11–3(e)(1)(E). For the sake of completeness, we add that even if we were to conclude that one or more of these claims had substance, we would view the error as harmless. As we noted at the outset of this opinion, we are entirely unpersuaded by Trust Company's claim it was entitled to attorneys' fees under the frivolous litigation statute.

Affirmed.