**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 7 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENEETH CIRCUIT

---

JOHN M. BELL, a/k/a Jack Bell;
JOHN ROBERT BELL, a/k/a Bob
Bell,

    Plaintiffs-Appellants,

v.

FUR BREEDERS AGRICULTURAL
COOPERATIVE, a cooperative
organized under the laws of Utah;
DANE DIXON, JACK MARCHANT,
STAN PETERSON, STAN STUART,
KENT VERNON, and RICK
WESTWOOD, former
directors/members of Fur Breeders
Agricultural Cooperative,

    Defendants-Appellees.

No. 01-4252

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 96-CV-939-ST)

---

Roy B. Moore (Tiani Xochitl Coleman, Salt Lake City, Utah, with him on the
briefs) of Roy B. Moore P.C. & Associates, Midvale, Utah, for Plaintiffs-
Appellants.

Perrin R. Love (Wendy B. Crowther of Clyde, Snow, Sessions & Swenson; and R.
Scott Rawlings with him on the brief) of Clyde, Snow, Sessions & Swenson, Salt
Lake City, Utah, for Defendants-Appellees.

Before **HARTZ** and **McKAY**, Circuit Judges, and **BRORBY**, Senior Circuit Judge.

**BRORBY**, Senior Circuit Judge.

This appeal arises from an action brought by John M. (Jack) Bell and John Robert (Bob) Bell against Fur Breeders Agricultural Cooperative and its former directors and members of the board of directors. The Bells allege that while they were members of the cooperative, Fur Breeders committed antitrust violations pursuant to Section 1 of the Sherman Antitrust Act (Sherman Act), 15 U.S.C. § 1, and Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a). The Bells contend Fur Breeders violated antitrust laws because the discounted price it charged the Bells for feed they hauled themselves did not cover their actual costs, thereby limiting their ability to remain competitive with other cooperative members who ranched within the cooperative's delivery route and paid a different price for delivered feed. The Bells appeal the district court's order granting summary judgment in favor of Fur Breeders and dismissing their federal antitrust claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## FACTUAL BACKGROUND

Fur Breeders began in 1939 when a small group of mink ranchers formed a cooperative for the purpose of providing mink feed to its members at a reduced cost. As an agricultural cooperative, it offers members cheaper feed and a competitive advantage over non-members due to its increased purchasing power, tax advantages, and efficiency gained by mixing large volumes of feed at central locations. Without a cooperative, members would also compete with each other for feed ingredients.

Fur Breeders operates two production plants located in Sandy and Logan, Utah; these plants mix raw ingredients to make feed. In the beginning, members picked up finished feed at these production plants. As the years progressed, the cooperative began delivering feed to its members on established delivery routes set by Fur Breeders' board members. The cooperative does not, however, deliver feed to all members. Instead, Fur Breeders determines the economic feasability of delivering feed to each location by considering the proximity of the location to the plants and the established delivery routes. Since 1980, the cooperative has maintained the same delivery route for feed from its Logan plant, with the furthest delivery point at least thirty miles away.

Since it began providing delivery of feed, the cooperative has charged its members who receive delivery, a price that includes delivery costs. To calculate the price per pound of delivered feed, Fur Breeders divides the total cost of delivered feed by the total pounds of delivered feed. The total cost for delivered feed includes the prior year's delivery costs as well as the annual purchasing and mixing costs. Fur Breeder's delivery costs include its expenditures for fuel, driver labor and benefits, and vehicle repairs, maintenance, depreciation, and insurance.

If a member whose ranch is located beyond the established feed route still requests delivery, Fur Breeders charges a surcharge based on the additional mileage from the feed route to the ranch. Members can avoid a surcharge if they purchase sufficient amounts to offset the additional costs. In order to calculate both the surcharge and the amount required to avoid a surcharge, the cooperative uses a delivery formula based on the cost to deliver feed from the feed route to the member's ranch. One of the cooperative's written objectives is to ensure members do not subsidize one another, including deliveries of feed outside the established delivery route.

In order to avoid a surcharge for delivery, members who ranch outside the

delivery route may instead pick up their feed at either the Logan or Sandy plant. Fur Breeders charges members a discounted price for picked-up feed that excludes the delivery cost. The cooperative calculates the discounted price by deducting the delivery cost per pound from the delivered price per pound. Between 1994 and 1999, the discounted price was one penny less per pound than the delivered price.

Jack Bell became a Fur Breeders member in 1955 and continued as a member until 2000; his son, Bob Bell, joined as a member in 1982, but discontinued his mink breeding business in 2000. The Bell ranch, located near Randolph, Utah, is more than seventy miles from both the Logan plant and the nearest point of the established delivery route. Because of the location of the Bell ranch and the small volume of feed purchased, the Bells never qualified for delivery without a surcharge. The Bells instead picked up their feed at the Logan plant, paying the discounted price for their feed. Between 1990 and 1999, the discount they received amounted to a total of $43,049.51.

PROCEDURAL BACKGROUND

It is against this backdrop and the costs associated with hauling their own feed that the Bells brought their antitrust litigation against Fur Breeders, seeking

injective relief and monetary damages.[1]  Fur Breeders filed a motion to dismiss the Bells' Robinson-Patman Act claims.  *See Bell v. Fur Breeders Agric. Coop.*, 3 F. Supp. 2d 1241, 1241-42 (D. Utah 1998).  The district court denied the motion to dismiss, determining their antitrust claims were sufficient to withstand such a motion.  *Id.* at 1244-45.

Thereafter, the Bells amended their complaint, adding a claim Fur Breeders also illegally restrained trade in violation of Section 1 of Sherman Act under 15 U.S.C. § 1.  The Bells then filed a motion for summary judgment on their Robinson-Patman Act claims, to which Fur Breeders responded by filing its own summary judgment cross-motion to dismiss all the antitrust claims.  A different district court judge was assigned to the case, who denied the Bells' motion for summary judgment and granted Fur Breeders' cross-motion.  In so doing, he dismissed the Bells' Robinson-Patman claims, holding the Bells presented no evidence "that Fur Breeders engaged in price discrimination."  The district court also dismissed the Bells' Section 1 Sherman Act claims, determining "Fur Breeders is an agricultural cooperative ... and therefore is immune from liability for a conspiracy with its members under the federal antitrust laws."  The court

---

[1]  As part of their damages, the Bells contend their annual cost in picking up feed and transporting it to their ranch was $16,787.20, for a total of at least $100,727.20.

further concluded no evidence existed showing that "Fur Breeders conspired with any person or entity besides itself and its members." Subsequently, the district court granted the Bells' motion for voluntary dismissal of their state law claims without prejudice, and this appeal followed.

On appeal, the Bells raise three issues contesting summary judgment in favor of Fur Breeders on their antitrust claims. Specifically, the Bells claim the district court erred in:

1) dismissing their Section 2(a) Robinson-Patman Act claim, as a matter of law and because disputed issues of material fact exist on whether Fur Breeders engaged in price discrimination;[2]

2) dismissing their Section 1 Sherman Act claim, ruling the cooperative's board members are, as a matter of law, exempt from antitrust liability for conspiring to discriminate in the price of a product sold by the cooperative to its members; and

3) dismissing their cause of action under Section 1 of the Sherman Act, holding the director and members are a single entity as a matter of law and

---

[2] The Bells did not brief their Section 2(f) Robinson-Patman Act claim on appeal. Therefore, it is deemed waived. *See Grant v. Pharmacia & Upjohn Co.*, 314 F.3d 488, 494 (10th Cir. 2002).

thereby incapable of conspiring, even though they are in direct competition with each other and other cooperative members, and serve in their own personal pecuniary interest.

In addition, the Bells contend the district court failed to: 1) make specific findings of fact and conclusions of law in rendering his written decision; 2) recognize facts in dispute; 3) cite any relevant case law [3] or rely on the law cited by the other district court judge on the motion to dismiss the Robinson-Patman claim; and 4) follow that judge's findings and holdings when considering the summary judgment motions on their Robinson-Patman and Sherman Acts claims.

## STANDARD OF REVIEW

"Although this court has noted that in the broad sense summary judgment should be used sparingly in antitrust cases, 'the usual rules governing summary judgment still apply.'" *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1253 (10th Cir. 2003) (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997)), *cert. denied*, ___ S.

---

[3] Contrary to the Bells' contention, the district court judge did rely on applicable case law in rendering his decision, as evidenced by the transcript on the hearing for summary judgment motion where he stated he read cases cited in the parties memoranda in preparation for the hearing.

Ct. ___, 2003 WL 21313823 (U.S. Oct. 6, 2003).  Consequently, "[w]e review the grant of summary judgment *de novo*, applying the same standard used by the district court under [Federal Rule of Civil Procedure] 56(c), viewing the evidence in the light most favorable to the nonmoving party."  *United States v. AMR Corp.*, 335 F.3d 1109, 1113 (10th Cir. 2003).  Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Having set forth the appropriate standard for summary judgment, we next address the Bells' contention the district court did not provide sufficient express facts or conclusions of law.  As stated in other antitrust cases, "[w]e are not limited to the grounds upon which the trial court relied but may base summary judgment on any proper grounds found in the record to permit conclusions of law."  *Sports Racing*, 131 F.3d at 882 (quotation marks and citation omitted).  Thus, even if a district court fails to make specific findings, we may affirm the decision on any ground for which a record exists sufficient to permit conclusions of law.  *See United States v. Roederer*, 11 F.3d 973, 977 (10th Cir. 1993).

Additionally, we address the Bells' contention that the district court failed,

when ruling on the motion for summary judgment, to follow the other district court judge's findings and holdings on the motion to dismiss. In so doing, it is important for us to review the difference in the standards applied to each type of motion. In deciding a motion to dismiss under Rule 12(b)(6), the federal courts generally "should not look beyond the confines of the complaint itself." *MacArthur v. San Juan County*, 309 F.3d 1216, 1221 (10th Cir. 2002) (quotation marks and citation omitted), *cert. denied*, 123 S. Ct. 2252 (2003). As the district court judge stated in his decision on Fur Breeders' motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell*, 3 F. Supp. 2d at 1242 (quotation marks and citation omitted). In contrast, a court bases a summary judgment motion on matters outside the complaint, such as other "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R. Civ. P. 56(c). The Supreme Court, in explaining the difference between the two types of motions, points out that the court must consider the conduct alleged in the complaint in deciding a motion to dismiss, while it must look beyond the pleadings to the evidence before it when deciding a motion for summary judgment. *See Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

In this case, in deciding Fur Breeders' motion to dismiss, the district court judge identified the issue before him as "whether the antitrust claims contained in the ... [c]omplaint are sufficient to withstand the motion to dismiss." *Bell*, 3 F. Supp. 2d at 1242. Applying the more rigorous standard for dismissal in antitrust cases, he determined the *allegations* in their complaint sufficient under the Robinson-Patman Act to survive a motion to dismiss. *Id.* at 1243-45. It is clear the court did not look beyond the allegations of the complaint nor make findings of fact as the Bells contend, but instead relied only on the allegations in the complaint for the sole purpose of ruling on the motion to dismiss. *Id.* at 1242-1245.

In contrast, the other district court judge looked beyond the pleadings to the evidence presented in ruling on Fur Breeders' motion for summary judgment. In addition to the pleadings, the parties submitted depositions, affidavits, and other documents for the court's consideration. Unlike the Bells, we do not believe that judge's decision is inconsistent with the earlier ruling on the motion to dismiss. Although the Bells' complaint may have sufficiently stated a claim for relief, the district court applied a different standard and viewed the evidence presented, rather than merely the allegations in the complaint, in granting Fur Breeders summary judgment on the antitrust claims.

HISTORICAL AND LEGISLATIVE BACKGROUND

We next turn to the antitrust issues before us, which require a brief examination of the history of agricultural cooperatives in relation to antitrust legislation. "In the late 1800s, as commodities became easier to transport and farmers became more aware of the competitive market, farmers began to organize cooperatives." Stephen D. Hawke, Note, *Antitrust Implications of Agricultural Cooperatives*, 73 Ky. L.J. 1033, 1034 n.6 (1985). These agriculture cooperatives provided farmers an effective means "to better control supply and raise the bids for their products." Matthew M. Harbur, *Anti-Corporate, Agricultural Cooperative Laws and the Family Farm*, 4 Drake J. Agric. L. 385, 394 (1999). The passage of the Sherman Act in 1890 threatened the continued use of agricultural cooperatives because they came within the scope of the Act's antitrust laws. *See Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 464 (1960); Harbur, at 395; Hawke, at 1036-37.

In order to remedy the effect of the Sherman Act on agricultural cooperatives, Congress added a provision in passing the Clayton Act, which exempted agricultural associations – including cooperatives – from the Sherman Act as long as they did not own capital stock or operate for profit. *See* Clayton Act of 1914, ch. 323, § 6, 38 Stat.730, 731 (1914) (codified at 15 U.S.C. § 17).

*See also National Broiler Mkt'g Ass'n v. United States*, 436 U.S. 816, 829-30 (1978) (Brennan, J., concurring); Louis Altman, 1 Callmann on Unfair Competition, Trademarks and Monopolies § 4:5 (4th ed. Supp. 2003); Harbur, at 395; Hawke, at 1034-35. Eight years later, Congress amended the Clayton Act by passing the Capper-Volstead Act, which extends the antitrust exemption to those cooperatives issuing stock in order to raise capital. *See* Cooperative Marketing Associations Act (Capper-Volstead Act), ch. 57 § 1, 42 Stat. 388 (1922) (codified at 7 U.S.C. § 291). *See also Nat'l Broiler*, 346 U.S. at 829-30 (Brennan, J., concurring); Hawke, at 1035; Altman, at § 4:5. The Capper-Volstead Act, in relevant part, states:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market , handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreement to effect such purposes: *Provided*, *however*, That such associations are operated for the mutual benefit of the members thereof ....

7 U.S.C. § 291.

In considering the Capper-Volstead exemption, the Supreme Court has determined it provides agricultural cooperatives a limited exemption from antitrust laws. *See Nat'l Broiler*, 436 U.S. at 822; *Sunkist Growers, Inc. v.*

-13-

*Winckler & Smith Citrus Prod. Co.*, 370 U.S. 19, 27-28 (1962); *Maryland & Virginia Milk Producers*, 362 U.S. at 464-66; *United States v. Borden Co.*, 308 U.S. 188, 204-05 (1939). However, over the years, this and other federal courts have recognized that certain actions by cooperatives may place them outside the Capper-Volstead exemption. *See Holly Sugar Corp. v. Goshen County Co-op. Beet Growers Ass'n*, 725 F.2d 564, 569 (10th Cir. 1984) (relying on *Borden Co.*, 308 U.S. at 204-05; *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1044 (2d Cir. 1980)). "For example, an agricultural marketing association cannot enter into agreements with persons not engaged in agricultural production, particularly for the purpose of acquiring monopoly power. Similarly, the association may not engage in predatory tactics such as picketing and harassment, coerced membership and discriminatory pricing." *Holly Sugar*, 735 F.2d at 569 (citation omitted). With this background, we proceed to the issues presented on appeal.

DISCUSSION

A.  Section 1 of the Sherman Act

Because the Bell's Sherman Act claims are related, we address them together. The crux of their Sherman Act antitrust claims center on their contention the Capper-Volstead exemption for agricultural cooperatives does not

-14-

extend to Fur Breeders or its board members because they participated in a conspiracy of discriminatory pricing and predatory practices intended to drive the Bells and other competitors out of business. Specifically, the Bells claim Fur Breeders' board members conspired to discriminate against them and at least two other cooperative members by failing to expand the existing delivery route to cover all cooperative members or provide a discount which included the actual cost of hauling the feed themselves. By so doing, the Bells claim the Board members purposely kept the cost of delivered feed down, which benefitted them, but not the Bells or the two other members who picked up their own feed. Consequently, they claim the district court erred in determining "[a]s a matter of undisputed fact and ... as a matter of law ... Fur Breeders is an agricultural cooperative within the meaning of ... the Clayton Act and therefore is immune from liability for a conspiracy with its members under the federal antitrust laws."

While it is true that conduct like discriminating prices and predatory practices may take cooperatives out of the Sherman Act exemption, we must address other more fundamental questions and determine whether Fur Breeders and its board members are a single entity exempt from the conspiracy provision in Section 1 of the Sherman Act. Section 1 of the Sherman Act provides that "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce

among the several States ... is declared to be illegal." *See* 15 U.S.C. § 1. This language has been interpreted by this and other courts to prohibit a "concerted action." *See Blankenship v. Herzfeld*, 721 F.2d 306, 309 (10th Cir. 1983); *Edward J. Sweeney & Sons, Inc. v Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980). In determining what constitutes a conspiracy under Section 1, we have held that a conspiracy "necessarily involves concerted action by a plurality of actors."[4] *Blankenship*, 721 F.2d at 309 (quotation marks and citations omitted).

The Supreme Court and other federal courts have determined that agricultural cooperatives, like corporations, do not have the plurality of actors necessary for a Section 1 conspiracy. *See, e.g.*, *Sunkist Growers*, 370 U.S. at 27-29 (holding three legal entities formed by 12,000 growers constitute a single organization or association, and are incapable of conspiring with each other under antitrust laws); *United Egg Producers v. Bauer Int'l Corp.*, 312 F. Supp. 319, 320 (S.D.N.Y. 1970) (concluding allegations of conspiracy are insufficient under Section 1 when conspirators consist of an agricultural cooperative and its own

---

[4] We find instructive the Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), where it carefully examined the Sherman Act and the intra-enterprise conspiracy doctrine. In that case, the Court explained the difference between antitrust actions under Section 1 for unlawful conspiracy and Section 2 for unlawful monopolies, and concluded that a Section 1 conspiracy cannot occur within a single entity. *Id.* at 767-70.

members and officers); *Shoenberg Farms, Inc. v. Denver Milk Producers, Inc.*, 231 F. Supp. 266, 267-68 (D. Colo. 1964) (reasoning that Section 1 does not apply to an intra-cooperative conspiracy alleged by a milk manufacturer, processor and distributor against a farmers' marketing cooperative, because "[i]t is the cooperative, not its constituent members, which is the relevant entity" in considering a Section 1 violation).

The Bells nevertheless contend we should not treat Fur Breeders' board members as a single economic entity as a matter of law because, as mink ranchers, they are in direct competition with each other and therefore, constitute a plurality of actors. They suggest the question of whether Fur Breeders and the board members are a single entity is an issue of fact, rather than a matter of law. In support of this argument, the Bells draw an analogy between this case and other antitrust cases involving corporations rather than cooperatives.

While a corporation generally cannot conspire with itself for antitrust purposes, this court, like others, recognizes a limited exception to the intra-corporate doctrine where the employees of a corporation "have 'an independent personal stake' and thus stand to benefit from conspiring with the corporation to restrain trade." *Motive Parts Warehouse v. Facet Enters.*, 774 F.2d 380, 387

(10th Cir. 1985) (quoting *Holter v. Moore & Co.*, 702 F.2d 854, 857 n. 8 (10th Cir. 1983))*.  See also Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974).  The Bells suggest the board members meet this exception because they compete with other members and in so doing, conspire to benefit themselves to the detriment of the Bells and at least two other members of the cooperative.

We do not think the fact that Fur Breeders' board members compete with other members is dispositive in the present instance.  Unlike traditional corporate officers who do not typically compete with each other in the market place, cooperative members are theoretically always in competition with each other because they are in the same trade and sell the same product.  Taken to the extreme, every action taken by Fur Breeders' board members could be seen as motivated by their desire to compete against other members who are also mink ranchers.  Instead, in determining whether the board members have an "independent personal stake" to conspire to benefit themselves, we ask whether their actions are "beyond the scope of their authority[5] or for their own benefit"

---

[5]  Relying on *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 597 F. Supp. 217 (D.D.C. 1984), *aff'd*, 797 F.2d 210 (D.C. Cir. 1986), Fur Breeders argues the independent stakeholder's exemption does not apply to cooperatives. In *Rothery Storage*, the court held the independent stakeholder exemption did not apply to agents of common carriers who served on the board of directors for a van

-18-

rather than the benefit of the cooperative as a whole. *See Green v. Associated Milk Producers, Inc.*, 692 F.2d 1153, 1156-57 (8th Cir. 1982); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952).[6] Moreover, Section 1 of the Sherman Act was not intended to cover officers or board members when they are "formulating and carrying out ... managerial policy." *Nelson Radio*, 200 F.2d at 914. *See also Sunkist Growers*, 370 U.S. at 28 (stating

line because common carriers are exempt from Section 1 of the Sherman Act, and Congress passed no statute expressly applying the independent stakeholder exemption to them. *Id.* at 226. Fur Breeders contends that, like common carriers, cooperatives are exempt from Section 1 and no statute has been passed expressly applying the independent stakeholder exemption to cooperatives. Because we are able to easily resolve this issue applying the independent stakeholder exemption, we decline to address this argument on appeal, thereby leaving it for future resolution.

[6] The Bells contend *Green* and other cases cited by Fur Breeders do not apply because the cooperatives at issue conspired for the benefit of all their members to the detriment of outside competitors or entities which were not members of the cooperatives. Specifically, they attack Fur Breeders' reliance on *Green*, 692 F.2d 115; *Sunkist Growers*, 370 U.S. 19; *United Egg Producers,* 312 F. Supp. 319; and *United States v. Maryland Co-op. Milk Producers, Inc.*, 145 F. Supp. 151 (D.D.C. 1956). However, we find the fundamental principles in *Green* and the other cases instructive in determining whether Fur Breeder and its board members are shielded by the Clayton and Capper-Volstead Acts and whether their actions fall within the independent stakeholder exception. Moreover, the Bells' argument contradicts their own reliance on cases that also involve restraint of trade affecting outside competitors and entities. *Relying on National Broiler Mktg. Ass'n*, 436 U.S. 816; *United States v. Topco Assoc.*, 405 U.S. 596 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350 (1967); *Maryland & Virginia Milk Producers*, 362 U.S. 458; *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173 (8th Cir. 1982); *Greenville Publ'g*, 496 F.2d 391; *Knuth v. Erie-Crawford Dairy Co-op. Ass'n*, 395 F.2d 420 (3d Cir. 1968) (subsequent negative history omitted).

the "business decisions" of a cooperative's directors are not illegal conspiracies).

In the situation before us, Fur Breeders is similarly situated to that of any cooperative or corporation whose board members act unilaterally in benefit of the single enterprise. Fur Breeders' objectives are to supply feed to its members at a lower cost than they could obtain individually; prevent competition among themselves for ingredients; and, in part, try to ensure members are not subsidizing each other's feed costs. These are legitimate purposes of agricultural cooperatives under the Clayton and Capper-Volstead Acts. *See* 7 U.S.C. § 291; 15 U.S.C. § 7. To meet these objectives, the cooperative, through its board members, sets internal policy on the amounts charged for delivered feed, the delivery route, and the reduced price for picked-up feed. While most cooperative members live within thirty miles from the feed plant, the Bells live more than seventy miles away. To either extend delivery to the Bell ranch or pay the Bells' actual hauling costs would substantially increase the costs to the cooperative.[7]

_____

[7] Fur Breeders contends that if the Bells' ranch were included in the delivery route: 1) the cooperative's actual delivery costs would increase anywhere from $25,000 to $80,000 annually, depending on the number of days the Bells required delivery each week, and 2) an additional truck and driver would be required because the route's deliveries could not be completed in one day, thereby further increasing its costs. On the other hand, if instead Fur Breeders paid the Bells the estimated hauling costs they are claiming, the cost to the cooperative increase $16,787.20 annually. Thus, regardless of whether Fur Breeders paid the Bells their estimated hauling costs or extended the delivery route to their ranch,

Ultimately, the board members established a discounted price for individuals, like the Bells, who haul their own feed, and a higher delivery price, based on actual delivery costs, for those members receiving delivery. In our view, the board members are well within their authority when making these "business decisions." *See Sunkist Growers*, 370 U.S. at 28; *Green*, 692 F.2d at 1156-57; *Nelson Radio & Supply*, 200 F.2d at 914.

Admittedly, as the Bells claim, the individual board members of the cooperative most likely benefitted from the established pricing and delivery route policies, but any policy benefitting the cooperative as a whole, as a competing business enterprise, most likely benefits most of its members and board members. It is also unlikely that every decision by Fur Breeders' board members will always benefit every individual member. While the Bells argue the reduced price for self-hauled feed did not adequately cover their actual costs, they nonetheless received feed from the cooperative at a reduced cost and benefitted from their membership because they could purchase feed at a cost less than they could obtain on their own or from other sources. Consequently, the board members' internal pricing decisions benefitted the membership as a whole. Thus, we conclude the

the cooperative's costs would substantially increase.

board members acted for the benefit of the whole rather than merely their own individual benefit. *See Green*, 692 F.2d at 1156-57; *Nelson Radio & Supply*, 200 F.2d at 914.

In sum, we conclude the prohibitions in Section 1 of the Sherman Act are inapplicable here because the cooperative's activities fall squarely within the antitrust exemptions in the Clayton and Capper-Volstead Acts. *See* 7 U.S.C. § 291; 15 U.S.C. § 17. Under these provisions, Fur Breeders and its board members are a single entity unable to conspire with itself. *See Sunkist Growers*, 370 U.S. at 27-29; *United Egg Producers*, 312 F. Supp at 320; *Shoenberg Farms*, 231 F. Supp. at 267-68. We also reject the Bells' argument the "independent stakeholder" exception allows us to treat the board members as conspirators who acted only to benefit themselves. Assuming the stakeholder exemption applies in agricultural cooperative cases, the facts here, when viewed in the light most favorable to the Bells, show the board members acted within their authority in setting prices and delivery policies for the good of the cooperative as a whole rather than merely for personal benefit. These activities do not amount to a violation of Section 1 of the Sherman Act. *See Green*, 692 F.2d at 1156-57; *Nelson Radio*, 200 F.2d at 914. For these reasons, we affirm the district court's decision to dismiss both of the Bell's Sherman Act claims on summary judgment.

## B. Section 2(a) of the Robinson-Patman Act

In support of their Robinson-Patman Act claim, the Bells renew their argument Fur Breeders participated in discriminatory pricing by applying a uniform delivery price to all members, except them and two other members. Specifically, the Bells claim Fur Breeders cannot discriminate in the price charged for feed to different members, and that the only nondiscriminatory means of pricing feed picked up by members is to discount the price by the actual hauling costs incurred.[8] As a result, they contend the district court erred in concluding they "failed to present evidence that Fur Breeders engaged in price discrimination within the meaning of [the Robinson-Patman Act]," and, consequently, dismissing their Robinson-Patman claim on summary judgment.

---

[8] The Bells also argue the district court erred because he applied equitable principles, rather than antitrust law, in granting summary judgment to Fur Breeders. In support, they rely solely on the judge's comment at the summary judgment hearing that if Fur Breeders paid Jack Bell's actual costs rather than reducing the price of picked-up feed by the average cost of delivery, "all the other members end up subsidizing him because of his distance." We reject the Bells' argument as this is not the only grounds on which the district court judge based his decision. Even without considering the subsidy issue, we find sufficient other grounds exist to support the district court's decision. *See Roederer*, 11 F.3d at 977. Moreover, the district court's statement on subsidizing the Bells was not improper. One of the cooperative's written goals, articulated in its "Board Discussion Item," is to ensure members do not subsidize each other with respect to feed costs.

Before examining the intricacies of the Bells' argument, we must again answer a fundamental, dispositive question: whether Section 2(a) of the Robinson-Patman Act applies to Fur Breeders and its members when the pricing issue involves only a single agricultural cooperative and its own members.

> In pertinent part, Section 2(a) of the Robinson-Patman Act states:
>
> It shall be unlawful for any person engaged in commerce ... either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality... where the effect of such discrimination may be to substantially lessen competition ....

15 U.S.C. § 13(a). In applying this provision to a cooperative, the Eighth Circuit has explained that "[o]ne element of a Robinson-Patman claim is that there be two sales to separate entities in interstate commerce." *City of Mt. Pleasant v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 278 (8th Cir. 1988).

Having already explained that an agricultural cooperative is considered a single entity unable to conspire with itself under Section 1 of the Sherman Act, it follows that an agricultural cooperative and its members are likewise a single entity for the purposes of the Robinson-Patman Act. To hold otherwise would produce an unsupportable, if not a disparate result. As the Eighth Circuit explained, "in reality the cooperative association is a single enterprise," and

-24-

transferring its products to its members does not involve the relationship of two separate entities, namely, a "buyer" and "seller," necessary to trigger Section 2(a) of the Robinson-Patman Act. *Id.* (ruling that intra-cooperative prices paid by members of a rural electric cooperative ultimately involve intra-cooperative transfers and not "sales" for the purposes of the Act.). "To hold that [such a] transfer is a sale under the Robinson-Patman Act would be to make antitrust liability hinge on the happenstance of the enterprise's internal organization and management practices, which in themselves have no economic significance." *Id.* at 279.

The Bells argue *City of Mt. Pleasant* is inapplicable because that case involved an electric rural cooperative's sale of electricity to its members at a lower price than sold to a third party. They also contend the cooperative relationship at issue in this case is unlike that of a corporation and its subsidiaries, or that of "single economic actors." In support, they assert "each [Fur Breeders'] member is an independent economic entity," incurring his or her own costs and profits, and making "independent decisions" on how to best utilize his or her assets. They point out that this relationship is unlike a subsidiary formed by a parent corporation for the purpose of providing profits, and limiting their tax and other liabilities.

We disagree with the Bells' analysis. First, the case of *City of Mt. Pleasant* persuasively explains why cooperatives are one single economic entity for the purposes of the Robinson-Patman Act. As the court in *City of Mt. Pleasant* points out, the cooperative is formed for the benefit of its members, and the relationship between members of a cooperative is "interdependent, not independent." *Id.* at 277. While *City of Mt. Pleasant* involved a suit by an outside entity challenging lower prices a cooperative charged its own members, we nevertheless find it instructive because it deals with an intra-cooperative pricing situation. It follows that if the Robinson-Patman Act was not implicated in *City of Mt. Pleasant*, where an outside competitor was affected, it is even less likely to be implicated in a purely intra-cooperative situation, where no outside restraint of trade is involved.

Moreover, while the Bells complain *City of Mt. Pleasant* is not applicable because it involves the sale of a product to a third party, we note the cases the Bells rely on also involve sales to outside interests suing companies for price discrimination.[9] We find these cases distinguishable because they do not involve

---

[9] *Relying on FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536 (1960); *Black Gold, Ltd. v. Rockwool Indus., Inc.,* 729 F.2d 676 (10th Cir. 1984)*; L & L Oil Co. v. Murphy Oil Corp.*, 674 F.2d 1113 (5th Cir. 1982); *Naifeh v. Ronson Art Metal Works*, *Inc.*, 218 F.2d 202 (10th Cir. 1954); *Anderson Foreign Motors v. New England Toyota Distrib., Inc.*, 492 F. Supp. 1383 (D. Mass. 1980).

intra-cooperative transfers between members, like those at issue here and in *City of Mt. Pleasant.*

In this case, as explained in our Sherman Act analysis, Fur Breeders is a single economic enterprise, with its main purpose to supply feed to members at a lower cost. As part of this common goal, the cooperative sets internal policy on the price charged for delivered feed and the reduced price for picked-up feed. The resulting sale of either delivered or picked-up feed simply constitutes product transfers within a single enterprise, which as explained in *City of Mt. Pleasant*, does not trigger the Robinson-Patman Act. As previously stated, this is particularly true in this case where it is purely intra-enterprise transfers with no outside entity or interest affected.

For these reasons, the district court properly concluded that no genuine issue of material fact exists and Fur Breeders is entitled to judgment as a matter of law on all issues raised concerning Section 2(a) of the Robinson-Patman Act. *See* Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322.

CONCLUSION

For the reasons set forth, we **AFFIRM** the district court's grant of summary judgment in favor of Fur Breeders and its board members, dismissing the Bells' claims filed pursuant to Section 1 of the Sherman Act and Section 2(a) of the Robinson-Patman Act.