**F I L E D**

**PUBLISH**

**May 23, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SANDY GREGORY; RICHARD
GREGORY,

          Plaintiffs - Appellants,

     v.

FORT BRIDGER RENDEZVOUS
ASSOCIATION, a Wyoming Non-
Profit Association,

          Defendant - Appellee.

No. 04-8100

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D. Ct. No. 03-CV-64-D)**

---

Bernard Q. Phelan, Phelan-Watson Law Office, Cheyenne, Wyoming, appearing
for the Appellants.

Timothy W. Miller, Casper, Wyoming, appearing for the Appellee.

---

Before **TACHA**, Chief Circuit Judge, **ANDERSON**, and **KELLY**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

---

     This appeal arises from an action brought by Plaintiffs-Appellants Richard

and Sandy Gregory against Defendant-Appellee Fort Bridger Rendezvous

Association ("FBRA"). The Gregorys allege that the FBRA engaged in a horizontal group boycott by refusing to permit them to sell their goods at the Fort Bridger Rendezvous ("Rendezvous") in violation of § 1 of the Sherman Act. *See* 15 U.S.C. § 1. Based on the same conduct, the Gregorys also allege that the FBRA conspired to monopolize sales in violation of § 2 of the Sherman Act. *See* 15 U.S.C. § 2. The District Court granted summary judgment for the FBRA on both claims. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

The Rendezvous is a historical reenactment held each Labor Day weekend at the Fort Bridger Historical Site in Wyoming in which participants reenact an annual rendezvous held by local fur traders from 1825 to 1840. The weekend boasts competitions in shooting, archery, and knife-throwing contests, and, relevant to this appeal, hosts "traders" who sell accurate replicas of pre-1840 goods. The event attracts between 40,000–50,000 visitors and is the largest of its kind in the region.

The State of Wyoming granted the FBRA, a nonprofit volunteer organization, the exclusive right to conduct the Rendezvous. The FBRA has approximately ninety members, a majority of whom trade at the Rendezvous. Some of the members of the FBRA's fourteen-person Board of Directors are also traders. One need not be a member of the FBRA to trade at the Rendezvous, however, as fewer than half of the traders are members of the FBRA.

Among other things, the FBRA monitors traders' wares for authenticity and assigns to traders the limited number of trading spaces allowed by its state permit. Under the FBRA's method of assigning spaces, priority is given to traders who participated in the previous year's Rendezvous. In this way, if a trader files a timely application for space, he generally will receive the same space he occupied the year before. Applications received by traders who did not trade at the previous Rendezvous, or by traders who were at the previous Rendezvous but filed their applications after the deadline, are accepted on a first-come, first-served basis.

Although not members of the FBRA, the Gregorys were long-time and large-volume Rendezvous traders who offered a wide selection of goods at low prices as compared to most other traders—including traders who were members and directors of the FBRA. Due to their seniority, the Gregorys had obtained two coveted trading spaces on the front row of the event, which they maintained by making a timely application every year to the following year's Rendezvous.

In addition to selling their replica pre-1840 goods at the Rendezvous, the Gregorys also sold them at a trading post located on the grounds of the Fort Bridger Historical Site. Their trading-post sales of goods were governed by a contract with the State of Wyoming rather than by the FBRA, however, and were

therefore not subject to the FBRA's standards of authenticity.[1]  Nonetheless, the

Gregorys sold many of the same goods at the trading post that they offered for

sale at the Rendezvous.  Additionally, the Gregorys have attended and sold their

goods at twenty-five similar events in other parts of the country.

According to the Gregorys, in the late 1990s the FBRA launched an

anticompetitive campaign against them.  The Gregorys complain of the following

conduct: (1) the Board, acting through a "trade committee," forced the Gregorys

to stop selling "unauthentic goods," while other traders, including Board

members, continued selling identical goods;[2] (2) the Board removed the camping

spaces next to the Gregorys' trading space (which the Gregorys used for storage

instead of camping) and created another trading space; (3) the Board voted to

allow a trader only one space on the front row;[3] (4) the Board proposed to auction

---

[1]The contract between the Gregorys and the State of Wyoming—which was later apparently assigned to the Fort Bridger Historical Association—expired in 2001.  The Gregorys chose not to renew the contract.

[2]The trade committee enforced the policy related to unauthentic goods by visiting traders' tents during the Rendezvous and inspecting the items they had for sale.  If one of the committee members noticed an unauthentic good, the trader was asked to put the good away.  The record reveals that, on average, the Gregorys were asked to put away approximately one item per year due to its lack of authenticity.

[3]In 2002, the State of Wyoming was engaged in an archeological project to uncover the foundations of several historical buildings on the Fort Bridger Historical Site.  When the foundations were discovered, the State prohibited that space from being used for Rendezvous trading.  Because of this prohibition, two spaces would be lost on the front row of the Rendezvous.  Rather than oust a

(continued...)

off the Gregorys' commercially advantageous trading area that they earned by seniority, while no other spaces became the subject of a proposed auction; and (5) the Board proposed severely limiting the range of merchandise permitted under the replica pre-1840 standard, which would have adversely affected large-volume traders like the Gregorys.[4]

In response to these actions taken by the Board, Sandy Gregory initiated her own course of conduct against the FBRA. She wrote several letters to the Board, complaining of its proposals and of "personal grudges" that some directors had against them. She also wrote to the State of Wyoming and accused the FBRA directors of gross mismanagement, embezzlement, permit violations, and ethics violations. She asked for more state involvement and control over the FBRA and requested that the State keep her communications confidential. Ms. Gregory also secretly recorded a traders' meeting at the 2000 Rendezvous and several telephone conversations between her husband and Kash Johnson, Chairman of the Rendezvous and a director of the FBRA. She then wrote a letter to Mr. Johnson accusing him of being unethical, unprofessional, and "twisted with irrational

---

[3](...continued)
trader from the space altogether, the FBRA's Board adopted a policy limiting each trader to one space on the front row. The policy affected one trader, and would have affected the Gregorys if they had traded at the 2002 Rendezvous.

[4]These latter two proposals were not implemented. The Gregorys also complain of other conduct taken by the FBRA that is not supported by the record.

anger."

Subsequently, the State of Wyoming instructed Mr. Johnson not to respond to future complaints from Ms. Gregory. As a result of this instruction, when the Gregorys sent their application to the FBRA in 2002 by registered mail, it was returned to them unopened. When Mr. Gregory asked Mr. Johnson why their application was returned, Mr. Johnson acknowledged that he had not realized that the returned letter was their application. Mr. Johnson told Mr. Gregory that if he resent it, it would be accepted. After the Gregorys reapplied and their application was accepted, however, the Board voted unanimously to reject the Gregorys' application for trading space at the 2002 Rendezvous and returned their application fee because of their "animosity and pattern of personal and professional attacks made upon the Board in their correspondence to both the Board members and the State of Wyoming."[5] As a result, the Gregorys were not permitted to trade at the Rendezvous in 2002.[6] The Gregorys contend that their

[5]It is not clear what precipitated the rejection of the Gregorys' application, although it seems to be based on another complaint lodged by Ms. Gregory in response to the Board's decision to permit only one front row space per trader. The letter, which was addressed to the Wyoming State Parks and Cultural Resources, accused the FBRA of sex discrimination and unethical business practices.

[6]Over the years, other traders' timely applications for space at the Rendezvous were denied because, for example, the proprietors refused to comply with the requirement that they dress in period attire or because they sold goods that did not comport with the pre-1840 standard. The ban from trading is not a permanent ban, however, as traders are permitted to reapply for space the

(continued...)

-6-

ouster was orchestrated to eliminate competition and that the reason proffered by the FBRA—Ms. Gregory's unruly behavior—is pretextual.

The Gregorys filed suit against the FBRA, alleging violations of §§ 1 and 2 of the Sherman Act. The District Court granted summary judgment in favor of the FBRA after finding that the Gregorys failed to show a plurality of actors necessary to establish concerted action or a conspiracy as required by those provisions. This appeal followed.

## II. DISCUSSION

A.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), we review a district court's grant of summary judgment de novo and apply the same legal standard used by the district court. *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1391 (10th Cir. 1992). "Summary judgment is appropriate when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (alteration in original).

B.    Section One of the Sherman Act

1.    *Concerted Action*

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

---

[6](...continued)
following year. It does not appear from the record that the Gregorys ever reapplied for space at the Rendezvous after their 2002 application was denied.

among the several States . . . is declared to be illegal." 15 U.S.C. § 1. Section 4 of the Clayton Act creates a private cause of action for any person who has been "injured in his business or property by reason of anything forbidden in the antitrust laws," and provides for treble damages. *See* 15 U.S.C. § 15(a); *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999).

Section 1 has been interpreted as prohibiting only concerted, multilateral action. *See Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1232 (10th Cir. 2003). Such action occurs when "two or more entities that previously pursued their own interests separately . . . combin[e] to act as one for their common benefit" in the restraint of trade. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). Underlying § 1's emphasis on concerted action is the rationale that when two formerly separate entities combine for their common benefit, their activity is "fraught with anti-competitive risk" because it "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Id.* at 768–69. For this reason, "unilateral conduct, regardless of its anti-competitive effects, is not prohibited" by § 1 of the Sherman Act. *Motive Parts Warehouse v. Facet Enters.*, 774 F.2d 380, 386 (10th Cir. 1985) (quoting *Contractor Util. Sales v. Certainteed Prods.*, 638 F.2d 1061, 1074 (7th Cir. 1981)). Therefore, it is critical to distinguish between unilateral and concerted action in establishing a violation of § 1.

The general rule, sometimes termed the "single-entity rule," *see Freeman v.*

*San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003), is that coordinated activity within a corporation does not represent a plurality of actors necessary to establish concerted action, *Copperweld Corp.*, 467 U.S. at 769. The Supreme Court has explained that "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Id.* Accordingly, "an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police." *Id.*

The Gregorys argue that the single-entity rule does not apply to the FBRA because a majority of its members are traders that are horizontally positioned competitors of the Gregorys themselves. In other words, they argue that the officers and members of the corporation are separate economic actors pursuing separate economic interests and therefore the principles in *Copperweld* do not apply. Indeed, we have recognized a limited exception to the general rule that a corporation cannot conspire with its officers or employees—namely, that "employees are capable of combining with their corporate employer when they have an 'independent personal stake,' and thus stand to benefit from conspiring with the corporation to restrain trade." *Motive Parts Warehouse*, 774 F.2d at 387 (quoting *Holter v. Moore & Co.*, 702 F.2d 854, 855 (10th Cir. 1983).

Relying on this Court's decision in *Bell v. Fur Breeders Agricultural*

*Cooperative*, the District Court disagreed with the Gregorys' contention. Likening the FBRA to a cooperative, the court held that because the FBRA's members will theoretically always be in competition with each other, the Gregorys were required to show either that the Board acted outside the scope of its authority or that Board members acted for their own benefit rather than the benefit of the FBRA as a whole. Having failed to make that requisite showing, the District Court concluded that only unilateral conduct was at issue and therefore the Gregorys had failed to show a violation of § 1 of the Sherman Act.

We agree with the Gregorys that the District Court erred in relying on *Bell* and hold that the FBRA represents a plurality of actors necessary to establish concerted action under the Sherman Act. In that case, a group of mink ranchers formed Fur Breeders Agricultural Cooperative for the sole purpose of providing mink feed to cooperative members at a reduced cost. The effect of the cooperative was to eliminate competition for minks based on the price of feed. Initially, members of the cooperative picked up the feed from one of two locations. After time, Fur Breeders began delivering feed to its members on an established delivery route. Because one of the cooperative's written objectives was to ensure that members did not subsidize one another, members on the route paid a price for the feed that included delivery costs. For members living off the route, Fur Breeders would still deliver, although with an additional surcharge. Off-route members could avoid the surcharge by picking up the feed themselves;

the feed was discounted to exclude normal delivery costs of one cent per pound.

*Id.* at 1227–28.

An off-route member filed suit against Fur Breeders and its board members alleging price discrimination in violation of the Sherman Act because the cooperative: (1) failed to expand its existing delivery route; and (2) refused to provide a discount which included the actual cost off-route members incurred by picking up the feed themselves.  Through this action, the member argued, Fur Breeders' board members purposely kept the cost of delivered feed down, which benefitted them, but not the three members who picked up their feed.  *Id.* at 1227.

In affirming summary judgment for Fur Breeders, we found that it was an agricultural cooperative whose "activities fall squarely within the antitrust exemption [for agricultural cooperatives] in the Clayton and Capper-Volstead Acts."[7]  *Id.* at 1235 (citing 7 U.S.C. § 291; 15 U.S.C. § 17).  As such, it was immune from liability for a conspiracy with its members.  In affirming summary judgment for the individual board members, we assumed without deciding that the independent stakeholder exception could apply to members of an agricultural

---

[7]Congress explicitly exempted agricultural cooperatives from the provisions of the Sherman Act.  *See* 7 U.S.C. § 291; 15 U.S.C. § 17.  There are several limited exceptions to this immunity, however, that place cooperatives outside the protection of the Capper-Volstead Acts.  For example, "agreements with persons not engaged in agricultural production, particularly for the purpose of acquiring monopoly power," are not exempted.  *Bell*, 348 F.3d at 1232.  "Similarly, the association may not engage in predatory tactics such as picketing and harassment, coerced membership and discriminatory pricing."  *Id.*

cooperative but stated that "[w]e do not think that the fact that Fur Breeders'

board members compete with other members is dispositive" in determining

whether the board members had an independent personal stake in the trade at

issue "and thus stand to benefit from conspiring with the corporation to restrain

trade."[8] *Id.* at 1233 (quotation and citation omitted). We explained that "[u]nlike

traditional corporate officers who do not typically compete with each other in the

market place, cooperative members are theoretically always in competition with

each other because they are in the same trade and sell the same product." *Id.*

Therefore, holding that competition among members, alone, satisfies the plurality

requirement would mean that every action taken by the board potentially violates

§ 1. *Id.* "Instead, in determining whether the board members have an

independent personal stake to conspire to benefit themselves, we ask whether

their actions are beyond the scope of their authority or for their own benefit rather

than the benefit of the cooperative as a whole." *Id.* at 1233–34 (quotation marks

and footnote omitted).

*Bell* cannot be understood to broadly exempt associations of horizontal

competitors from liability under the antitrust laws so long as its board members

---

[8]Fur Breeders argued that the independent stakeholder exemption did not apply to cooperatives, instead maintaining that individual members of the agricultural cooperative were exempt from liability under the antitrust laws because the cooperative itself was exempt from the antitrust laws. *Bell*, 348 F.3d at 1233 n.5. The court did not address this argument because it "easily resolve[d] [the] issue applying the independent stakeholder exemption." *Id.*

are acting within the scope of their authority and with the intention to benefit the association as a whole. Such a rule would eviscerate the protections of the Sherman Act because it would permit, for example, horizontal competitors to form associations in which all competitors agree to sell their product at the same supracompetitive price. This hypothetical association would have the "authority" to decide at what price to sell their products, and supracompetitive pricing would benefit the whole group, rather than any individual competitor. But this type of price-fixing agreement is exactly what the antitrust laws were designed to prohibit.

Rather, *Bell* stands for the proposition that an agricultural cooperative and its board members constitute a single entity and are thus exempt from antitrust liability when the cooperative is not engaged in one of the excepted activities that removes it from the protections of the Clayton and Capper-Volstead Acts. *See id.* at 1235; *supra* note 8. *Bell* further provides that in the context of a board of director's day-to-day operating decisions, individual board members are deemed part of the single entity so long as they act within the scope of their authority and for the benefit of the entity, even though the individuals might have an independent personal stake in the action taken by the entity. In other words, in determining the applicability of the independent stakeholder exception to the single-entity rule in the context of an association of potential competitors, the proper focus is on the type of decision made by the board. *See AD/SAT, Div. of*

*Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d cir. 1999) (recognizing that to the extent the challenged decision involves the day-to-day operations of a trade association, board members and the association should be regarded as a single entity).

In this case, the Board's decision cannot be fairly characterized as one involving day-to-day operations of the FBRA. *See, e.g., Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985) (stating that rule-of-reason analysis applies to a nonprofit cooperative's decision to expel a retailer from membership). The decision to deny the Gregorys' application deprived them of the ability to compete at the 2002 Rendezvous—a decision from which every other member-trader stood to benefit. *See AD/SAT, Div. of Skylight*, 181 F.3d at 234 (noting that there is no practical problem in treating those decisions of a trade association that tend to reduce competition as a conspiracy of its members) (quoting 7 Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 1477, at 347). For these reasons, the District Court inappropriately relied on *Bell* in granting summary judgment in favor of the FBRA.

Finally, we note that unlike a typical corporation in which the officers and directors are not separate actors pursuing separate economic interests, the members of the FBRA horizontally compete for the sale of replica pre-1840 goods. These types of associations "have traditionally been the objects of antitrust scrutiny" because their members "often have economic incentives to

-14-

restrain competition." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988); *see also Northwest Wholesale Stationers*, 472 U.S. 284; *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982). As such, we hold the challenged action taken by the FBRA—excluding the Gregorys from selling products at the 2002 Rendezvous—involves a plurality of actors necessary to establish the concerted action requirement set forth in § 1 of the Sherman Act.

2.    *Restraint of Trade*

Section 1 prohibits only concerted action that unreasonably restrains trade. *Northwest Wholesale*, 472 U.S. at 289. As we explained in *Diaz v. Farley*:

> The Supreme Court has developed two main analytical approaches for determining whether a defendant's conduct unreasonably restrains trade: the *per se* rule and the rule of reason. The rule of reason is the usual method of analyzing conduct under the Sherman Act. It requires the factfinder to weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Per se* analysis is reserved for agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

215 F.3d 1175, 1182 (10th Cir. 2000) (citations, alterations, and quotations omitted).

The Gregorys contend that the FBRA's action in excluding them from the 2002 Rendezvous is a horizontal "group boycott" (i.e., a concerted refusal to deal)

and, as such, is per se illegal under § 1. *See id.* at 1182. The Supreme Court has clearly held, however, that "not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominantly anticompetitive consequences." *Northwest Wholesale*, 472 U.S. at 295. Rather, "the decision to apply the *per se* rule turns on whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output or instead one designed to increase economic efficiency and render markets more, rather than less, competitive." *Id.* at 289–90 (quotation and alteration omitted). Moreover, "there is a presumption in favor of [the] rule of reason standard," *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988); by contrast, the per se rule is appropriate only in "relat[ion] to conduct that is manifestly anticompetitive," *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50 (1977). Of course, some group boycotts have been deemed per se illegal, but that approach "has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). Finally, per se treatment of group boycotts should not be undertaken "indiscriminately" especially when "the economic impact of certain practices is not immediately obvious." *Id.* at 458–59.

The Gregorys have failed to show that the Board's conduct is manifestly anticompetitive. Because more traders apply to sell products at the Rendezvous

than space permits, the FBRA must be able to exercise the authority granted to it by the State of Wyoming to determine which applications to accept. This exercise is rendered impossible, however, when the threat of antitrust liability looms overhead. Moreover, the denial of an application is not ordinarily likely to result in predominantly anticompetitive effects because the denial of one trader's application opens the market to another competitor. Further, there is evidence that other traders have been denied space at the Rendezvous for reasons other than anticompetitive purposes. *See supra* note 6. The act of denying a trader space at the Rendezvous therefore "does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect." *See Northwest Wholesale*, 472 U.S. at 296.

Nonetheless, the Gregorys argue that per se treatment is warranted because the FBRA cut off access to a facility necessary to enable them to compete—namely, the Rendezvous. *See id.* at 294, 296 (stating that per se treatment of conduct that is not necessarily anticompetitive may be warranted if the association possesses market power or exclusive access to facility necessary to compete). This theory of liability, which is known as "the essential facilities" or "bottleneck" doctrine, imposes upon "a business or group of businesses which controls a scarce facility . . . an obligation to give competitors reasonable access to it." *Pittsburg County Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 721 (10th Cir. 2004). The doctrine generally applies in situations in which

-17-

the plaintiff is unable to compete in the relevant market—in this case, the market for replica pre-1840 goods—without access to a facility controlled by another. For example, "the doctrine has been applied to electric transmission lines, football and basketball stadiums, downhill ski hills, natural gas pipelines, and local telephone facilities." *See In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1451 (C.D. Cal. 1993) (discussing cases).

In order to establish antitrust liability based on the essential facilities doctrine, a plaintiff must show: "(1) control of the essential facility by a monopolist; (2) a competitor's inability to duplicate the facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Pittsburg County Rural Water Dist. No. 7*, 358 F.3d at 721. The Gregorys do not attempt to satisfy the above elements; they merely make the conclusory allegation that the space at the Rendezvous is essential to selling replica pre-1840 goods. We therefore decline to address this argument, especially since it is not apparent on its face that the Gregorys cannot sell their goods elsewhere.[9] *See Am. Airlines v. Christensen*, 967 F.2d 410, 415 n.8 ("It is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for the appeal." (citing Fed. R. App. P. 28(a)(4)). In any event, we think that this situation is

_____

[9]Indeed, as noted above, prior to the 2002 Rendezvous, the Gregorys sold many of the same goods that they sold at the Rendezvous at the trading post which was immediately adjacent to the Rendenzvous.

particularly unsuitable for per se treatment given the limited space at the

Rendezvous. A finding that the FBRA's decision to deny a trader space to sell

products amounts to a per se violation of the Sherman Act would unfairly expose

the association to treble damages each time it exercised its authority under the

State permit. As such, we hold that the Gregorys have not shown that the conduct

at issue constitutes the type of horizontal group boycott that warrants per se

treatment.[10]

Our conclusion that per se treatment is not appropriate in this case does not

end our inquiry under § 1. Rather, we turn our focus to the rule of reason. We

have explained the shifting burden of proof under the rule of reason as follows:

> [T]he plaintiff bears the initial burden of showing that an agreement
> had a substantially adverse effect on competition. If the plaintiff
> meets this burden, the burden shifts to the defendant to come forward
> with evidence of the procompetitive virtues of the alleged wrongful
> conduct. If the defendant is able to demonstrate procompetitive
> effects, the plaintiff then must prove that the challenged conduct is
> not reasonably necessary to achieve the legitimate objectives or that
> those objectives can be achieved in a substantially less restrictive
> manner. Ultimately, if these steps are met, the harms and benefits
> must be weighed against each other in order to judge whether the
> challenged behavior is, on balance, reasonable.

---

[10]Our inquiry into whether the challenged action warrants per se or rule of reason treatment does not include an inquiry into the specific motive of the alleged conspirators. Rather, we look to the type of action involved to determine whether it has such a pernicious effect on competition such that per se analysis is warranted. Whether the conspirators' justification for its conduct is pretextual—as the Gregorys allege here—is properly considered under the rule of reason analysis. *See Northwest Wholesale*, 472 U.S. at 296 n.7 (stating that actions that are not substantially related to the asserted procompetitive purpose might warrant an inference of anticompetitive animus).

*Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998) (internal citations omitted).

The purpose of the antitrust laws is to protect the public. *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 960 (10th Cir. 1990). We therefore consider the FBRA's conduct "in light of its effect on consumers, not on competitors." *See id.* Accordingly, under the first prong of the rule of reason test, the Gregorys cannot simply show that the challenged action adversely affected their business—they must demonstrate an adverse effect on competition in general. *Id.*; *see also Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1548 (10th Cir. 1996) ("An antitrust plaintiff must show that the challenged conduct adversely impacts competition in general because the antitrust laws were enacted for the protection of competition, not competitors.") (quotation marks and alteration omitted); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1364 (Fed. Cir. 1999) ("The federal antitrust laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.") (quotations and citations omitted).

The Gregorys make no argument that the denial of their 2002 application violates the rule of reason test. Indeed, the record reveals that once their application was denied, one or two other traders were permitted space to sell replica pre-1840 goods at the 2002 Rendezvous. *See Coffey*, 955 F.2d at 1393 (plaintiff fails to meet burden under rule of reason test when restraint amounts to

a reshuffling of competitors with no detrimental effect on competition). As such, summary judgment was appropriately entered against the Gregorys. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 939 (10th Cir. 2005) (stating that an appellate court may affirm the judgment of a district court on any ground supported by the record, "provided the litigants have had a fair opportunity to develop the record") (quoting *Ross v. U.S. Marshal*, 168 F.3d 1190, 1194 n. 2 (10th Cir.1999)).

C.    Section 2 of the Sherman Act

Under 15 U.S.C. § 2, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." Because the Gregorys fail to establish that the FBRA's challenged conduct harmed the competitive process under § 1, their conspiracy to monopolize claim under § 2 likewise fails. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) (stating that agreements that do not harm the competitive process do not amount to a conspiracy to monopolize); *see also Intergraph Corp.*, 195 F.3d at 1363–64 (dismissing § 1 and § 2 conspiracy claims because agreement had no adverse effect on competition); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (dismissing a conspiracy to monopolize claim when the plaintiff could not prove that the agreement harmed overall competition).

### III. CONCLUSION

We conclude that the District Court erred in holding that the FBRA did not constitute a plurality of actors necessary to establish concerted action or a conspiracy in violation of §§ 1 and 2 of the Sherman Act. We nonetheless AFFIRM summary judgment in favor of the FBRA because the Gregorys fail to establish that the challenged action constitutes an unreasonable restraint of trade.